**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 20 B 17355 |
| | ) | |
| JAMES SAMATAS, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| | ) | |
| _____ | ) | |
| | ) | |
| FRANK KOKOSZKA, Chapter 7 Trustee, | ) | Adversary No. 21 A 00237 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES SAMATAS DISCRETIONARY | ) | |
| TRUST U-A-D 9/8/88, JAMES SAMATAS, | ) | |
| not individually, but in his capacity as Co- | ) | |
| Trustee of the James Samatas Discretionary | ) | |
| Trust u/t/a dated 9/8/88, CRAIG LABUS, | ) | |
| not individually, but in his capacity as Co- | ) | |
| Trustee of the James Samatas Discretionary | ) | |
| Trust u/t/a 9/8/88, and JAMES SAMATAS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on the six-count adversary complaint filed by Frank Kokoszka, chapter 7 trustee (the "Trustee") for the estate of James Samatas (the "Debtor"), against the Debtor, the James Samatas Discretionary Trust U-A-D 9/8/88 (the "Trust"), and the Debtor and Craig Labus, not individually but in their capacities as co-trustees of the Trust (collectively, the "Defendants"). The Trustee seeks a determination, pursuant to sections 541, 544, and 550 of the Bankruptcy Code, 11 U.S.C. §§ 541, 544, and 550, and sections 5 and 6 of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5 & 6, that the assets of the Trust are property of the

Debtor's bankruptcy estate, as well as avoidance and recovery of certain alleged fraudulent transfers made by the Debtor to the Trust and related relief.[1]

Also before the Court are two post-trial motions filed by the parties. The first is the Trustee's Amended Motion for Sanctions and Adverse Inferences (the "Adverse Inferences Motion"), in which he asks the Court to impose an adverse inference that certain documents do not exist and that testimony to the contrary not be taken into consideration. (Dkt. 161.[2]) The second is the Defendants' motion for a directed finding on Counts I–IV of the adversary complaint. (*See* Dkt. 167-1.) The Defendants initially asked for a directed finding at the conclusion of the Trustee's case-in-chief. (Tr. 2 at 395:7–402:17, 409:22–411:21.[3]) That request was denied without prejudice. (*Id.* at 407:6–409:21, 410:12–412:15.) The Defendants then renewed their request for a directed finding, both after their case-in-chief and in their post-trial brief. (Tr. 3 at 751:14–17; Dkt. 167.)

Based on the evidence and testimony presented at the four-day trial held on the adversary proceeding and a review of all relevant documents, exhibits, arguments, and case law, and for the reasons set forth below, the Court finds in favor of the Trustee and against the Defendants on Counts I, II, IV, and VI of the complaint and finds in favor of the Defendants and against the Trustee on Count III. As to the parties' post-trial motions, the Court will grant the Trustee's Adverse Inferences Motion as outlined *infra*; will deny the Defendants' request for a directed

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

[2] Unless otherwise noted, all docket references are to Adv. No. 21 A 00237.

[3] Transcript references are to the transcripts of the trial of the adversary proceeding which took place on June 24, 2025 ("Tr. 1"), June 25, 2025 ("Tr. 2"), July 2, 2025 ("Tr. 3"), and August 11, 2025 ("Tr. 4") and can be found at Dockets 150, 149, 152, and 156, respectively, in Adv. No. 21 A 00237.

finding on Counts I, II, and IV; and will grant the Defendants' request for a directed finding on Count III. Count V will be dismissed as moot.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O).

## FACTUAL BACKGROUND

The material facts in this matter are gleaned from the docket, the pleadings and the exhibits attached thereto, and the testimony given and evidence admitted at a four-day bench trial held on June 24, 2025, June 25, 2025, July 2, 2025, and August 11, 2025. In addition to the Debtor, four other witnesses testified at that trial: (1) Craig Labus, the co-trustee of the Trust; (2) Daniel M. Fitzpatrick, the Trustee's expert witness;[4] (3) Philip Tortorich, the Defendants' expert witness;[5] and (4) Charles Harris, the Trustee's rebuttal witness.[6] Having weighed the credibility of the

---

[4] Fitzpatrick is an attorney who has thirty years of experience as a wealth management and fiduciary professional. (Ex. S at 2.) He is a Registered Trust and Estate Practitioner as certified by the international Society of Trust and Estate Practitioners and has been designated a Master Certified Independent Trustee by the Independent Trustee Alliance. (*Id.*) At the time of trial, Fitzpatrick was the president of Northway Wealth Advisors, LLC, an independent advisory firm that he founded in 2017 which helps individuals and families to fulfill their fiduciary responsibilities as trustees of personal trusts, executors of estates, and directors of private foundations. (Tr. 2 at 295:3–13; Ex. S at 2.*)* His firm also provides fiduciary-related advice and assistance to money managers and professional advisory firms serving high-net-worth clients, as well as mediation and expert witness services in support of fiduciary-related dispute resolution. (Ex. S at 2.) Fitzpatrick prepared an expert report which was admitted into evidence as Ex. S.

[5] Tortorich is an attorney with over twenty-four years of experience practicing exclusively in the areas of trusts and estates, estate planning, and private client services. (Tr. 3 at 663:6–664:24; Dkt. 139, Ex. A at 1.) He started his own firm in February 2025, where he primarily advises high-net-worth families and businesses on estate planning and management. (Tr. 3 at 663:23–665:25; Dkt. 139, Ex. A at 2.) Tortorich was previously an attorney at the Katten Muchin law firm for eighteen years. (Tr. 3 at 663:12–15, 702:16–20.) During that time, he represented the Debtor, his family, and the Trust. (*Id.* at 702:24–703:5.) Although Tortorich prepared an expert report in connection with this matter, it was not admitted into evidence. (*See* Dkt. 139, Ex. A.)

[6] Harris has more than twenty-five years of experience as a trust-and-estate attorney and was the co-head of the Chicago Private Wealth Group at Katten Muchin at the time of trial. (Tr. 4 at 765:11–14.) He was initially assigned to be the estate planner for the Samatas family, principally doing work for the Debtor's parents and then, later, for their three children and their discretionary trusts. (*Id.* 766:12–19.) According to Harris, he had "sole responsibility"

3

witnesses and reviewed the trial transcript and evidence, the Court summarizes the relevant facts as follows.

### The Debtor's Discretionary Trust

On or around September 8, 1988, the Debtor's father, George Samatas, formed the Trust for the Debtor's benefit.[7] (Dkt. 138 ¶ 7.[8]) At all relevant times, the trustees of the Trust were the Debtor and Labus.[9] (*Id.* ¶ 10; Tr. 1 at 27:2–9.) Labus is a close, personal friend of both the Debtor and his family and has served as their accountant for more than twenty-five years. (Tr. 1 at 29:14–16; Tr. 2 at 481:12–17.) He is also the accountant for the Trust. (Tr. 1 at 29:17–18.)

At its inception, the Trust's primary assets consisted of interests in several entities that owned and operated skilled nursing facilities. (Dkt. 138 ¶ 15.) In addition, the Debtor claims that the Trust owns certain personal property, including stock in Oxford Bank, artwork, paperweights, furniture and fixtures, antiques, a pen collection, gemstones, and claims against third parties. (*Id.* ¶ 17.)

The Trust contains various key provisions relevant to the matter at bar. Among them, Article IX, captioned "Spendthrift Provision," pertains to the ability of creditors to reach the Trust corpus. The provision states as follows:

> No income or principal distributable or to become distributable with respect to a separate trust shall be transferable, assignable or subject to being anticipated in any manner whatsoever, charged or encumbered by any

---

for the Debtor and his Trust beginning in 2000, overseeing the clients and answering all of their questions. (*Id.* at 766:20–767:7.)

[7] The Trust is one of three identical discretionary trusts that were established by George Samatas for the benefit of the Debtor and his two siblings, John Samatas and Cynthia Thiem. (Dkt. 80 at ¶ 7.)

[8] Docket 138 is the parties' Joint Pretrial Statement. The stipulated facts on pages 3–11 appear in section b. Unless otherwise noted, all references to numbered paragraphs in Dkt. 138 are references to the stipulated facts in that section.

[9] At the inception of the Trust, the two trustees were the Debtor and an individual named George Colis. (Dkt. 138 ¶ 9.) Colis was replaced as trustee by Labus in January 1997. (*Id.*; Tr. 1 at 28:5–29:4.)

4

person beneficially interested in such separate trust, or subject to interference or control by any creditors of said person, or subject to any claim for alimony or for the support of a spouse pursuant to a decree or separation agreement, or to be taken or reached by any legal or equitable process in satisfaction of any debt, liability or obligation of said person prior to its receipt by said person; provided, however, that the provisions of this Article shall not prevent the exercise of, or transfer pursuant to the exercise of, any power of appointment granted hereunder.

(Ex. A, Art. IX.[10])

Article IV addresses distributions from the Trust. Section 1 of that article, in particular, concerns distributions of income and principal:

With respect to each separate trust, the Trustee is hereby authorized, in the sole discretion of the Trustee, at any time and from time to time, to distribute all or any part of the net income and/or principal of such separate trust to the beneficiary of such separate trust, as the Trustee deems desirable for the best interests of said beneficiary, or to accumulate all or any part of such net income and add the same to the principal of such separate trust to be held, administered and distributed as a part thereof; provided, however, no distribution shall be made pursuant to the provisions of this Section which would discharge or satisfy a legal obligation of the Grantor.

(*Id.*, Art. IV § 1.)

Although the foregoing provision empowers the "Trustee" to make distributions, section 3 of Article XIV, entitled "Beneficiary Powers and Restrictions," clarifies that a trustee who is also a beneficiary under the Trust—as the Debtor is here—does not have such authority:

Except with respect to any power of appointment, or as may be expressly provided herein to the contrary, no restricted Trustee (hereinafter defined) shall have any voice, determination or vote relating to any discretionary distribution of the income or principal of any separate trust hereunder, and all such decisions shall be made by the Co-Trustee or Co-Trustees of such separate trust who are not restricted Trustees.

(*Id.*, Art. XIV § 3.)

Section 4 of Article XV, in turn, defines "restricted [t]rustee" as follows:

---

[10] All references to exhibits ("Ex. __") are to the Trustee's exhibits admitted into evidence over the course of the four-day trial. The Trust Agreement itself can also be found in Exhibit A to the Trustee's amended complaint filed on June 30, 2022, at Docket 74.

5

> As used herein, with respect to any separate trust, the term "restricted trustee" shall include any current beneficiary of such separate trust and any individual who shall have a legal obligation to support any current beneficiary of such separate trust; provided, however, that "a legal obligation to support a beneficiary", as used in this Section, shall not include an obligation to support arising solely by reason of an individual acting as guardian or conservator of said beneficiary.

(*Id.*, Art. XV § 4.)

In addition, section 1 of Article VII addresses the role of the investment advisor of the

Trust, who at all relevant times was the Debtor:

> Notwithstanding any provision of this Agreement to the contrary, with respect to each separate trust hereunder for which an Investment Advisor shall be then acting, the Trustee of such separate trust shall sell, vote or take any other action with respect to the investment of the trust assets only upon the written instructions of said Investment Advisor. The Trustee of each such separate trust is hereby relieved of any liability for any loss sustained by such separate trust as a result of any decision made by the Investment Advisor to act or refrain from acting with respect to the investment of the trust assets, or the failure of the Investment Advisor to make any such decision, and the Trustee shall be under no duty to review or make recommendations with respect to the investment of the trust assets. All or any part of the rights and powers conferred upon the Investment Advisor pursuant to the provisions of this Section may be relinquished at any time or from time to time by the Investment Advisor by notice in writing delivered to the Trustee of the separate trust to which such release relates. In the exercise of the rights and powers conferred upon the Investment Advisor pursuant to the provisions of this Section, the Investment Advisor shall be subject to all of the privileges, duties and obligations of a Trustee hereunder.

(*Id.*, Art. VII § 1.)

Finally, addressing who may bind the Trust, section 15 of Article XI provides, in relevant

part, as follows:

> [W]ith respect to any separate trust of which there is more than one (1) person and/or corporation serving as Trustee, any one (1) Trustee may sign any checks, agreements or other documents on behalf of the trust and such signature shall bind the trust in the same manner as though said check, agreement or other document had been signed by all then acting Trustees of such trust, and no person dealing with said signing Trustee shall be

6

obligated to inquire as to the acquiescence of the other Trustees to such action by the signing Trustee.

(*Id.*, Art. XI § 15.)

### The Debtor's Roles Under and Interpretation of the Trust

The Debtor holds multiple roles with respect to the Trust. Not only is he the beneficiary, but he also serves as a co-trustee—albeit a restricted one—and the investment advisor of the Trust. (*Id.*, Art. IV, Art. VII § 2; *see also id.*, Art. XIV § 1.) Because the Debtor is a both beneficiary and a co-trustee, he is not authorized to "have any voice, determination or vote" in connection with discretionary distributions of the income or principal of the Trust. (*Id.*, Art. XIV § 3; Tr. 1 at 55:3–23; *see also* Ex. A, Art. XV.) Rather, those distributions must be executed and approved by Labus, the non-restricted trustee. (Ex. A, Art. XIV § 3; Tr. 1 at 55:3–23.)

Tortorich, the Defendants' expert witness, testified at trial that one of the main reasons to restrict a beneficiary-trustee from making distributions to himself is to safeguard and maintain the spendthrift nature of the Trust. (Tr. 3:675:18–23 ("[I]f someone had the discretionary ability to make distributions to [himself], that would defeat the whole purpose of that trust.").) He also discussed why the Trust in this matter was created to provide the beneficiary-trustee and the investment advisor with distinct and different levels of authority:

> [W]ith the setup of this Trust, . . . beneficiaries are co-trustees with an independent trustee. And then we have the beneficiary, who is also the investment advisor. The reason why we set that up is that there are issues with the beneficiary being able to make discretionary distributions to themselves, but they're allowed to make investment decisions without breaking any of the rules of the Trust.
>
> For instance, the center provisions of the Trust, the asset protection provisions of the Trust are not violated if the person who's the beneficiary can make investment decisions. But, if they're making discretionary distributions of income or principal to themselves, then that's a problem. So we restrict them as a trustee from making discretionary distributions to themselves, but we allow them to have the freedom to invest without having

to go to their co-trustee.

(*Id.* at 671:4–22.) "We want the Trust to stay insulated," Tortorich explained, "so we don't allow [beneficiary-trustees] to make distributions to themselves. Their co-trustee would have to make that discretionary distribution decision. . . . The same does not apply to investment decisions." (*Id.* at 673:7–16.)

As to the role of the investment advisor, Tortorich clarified that the Debtor, as investment advisor, can make the investment decision but cannot act on it. (*Id.* at 676:19–677:4.) Rather, he said, "the decision has to be executed [by] the [non-restricted] trustee": "the investment advisor directs the trustee to do something. The trustee then has no discretion; [he has] to do it." (*Id.* at 677:3–7.) According to Tortorich, although "the investment advisor has all the powers of the trustee to . . . sell, vote, or take any other action with respect to the investment of the trust asset[s]," he does not have the authority to make distributions. (*Id.* at 680:16–22, 735:3–8.)

As for other types of transfers, the Debtor and Labus both testified that there was an understanding between them that any funds disbursed from the Trust would be considered "loans" that would be paid back, unless a transfer from the Trust was specifically designated otherwise. (Tr. 1 at 66:4–6; Tr. 2 at 256:12–16, 485:4–486:6; *see also* Tr. 2 at 319:7–11.) Labus testified at trial that disbursements from the Trust to the Debtor were classified as loans so that the Debtor's creditors could not reach the transfer once it was made. (Tr. 1 at 66:17–25.) Tortorich explained the designation in a different way. He said that the "whole nature of the Trust is to be multi-generational by design." (Tr. 3 at 687:22–23.) Accordingly, the aim was "to limit distributions as much as possible"; "if the beneficiary need[ed] access to funds," the disbursement would be characterized as a "loan" so that the money would come back into the Trust for "future generations." (*Id.* at 687:23–688:5.)

8

Regarding his understanding of the role of investment advisor, the Debtor testified that the terms of the Trust gave him broad authority to make loans:

> Q: [I]s there any . . . restriction that you know of in the Trust that prevents the investment advisor himself to make a direction to a trustee to make a loan?
> A:  No. The investment advisor can do – according to what I've read and my interpretation of what I've been advised, you can get loans.
> Q: All right. And . . . in your interpretation, could the investment advisor instruct a restricted or non-restricted trustee to . . . carry out the loan?
> A: Yes.

(*Id.* at 641:25–642:11.) Indeed, the Debtor testified that the Trust gave him the sole authority as investment advisor to loan money to himself and then to unilaterally forgive that loan. (*Id.* at 569:19–570:9.) In fact, the Debtor asserted that as the investment advisor of the Trust, he could do almost anything that an unrestricted trustee could do:

> Q: [A]s investment advisor, what things couldn't you authorize yourself to do as co-trustee?
> A:  Mr. Levin, I have two hats on.  I'm a co-trustee, and I'm an investment advisor. I have distinct roles within the Trust agreement.
> Q:  All right.  What does an investment advisor do?
> A: Could do everything I read earlier this morning.
> Q:  All right.
> A:  All those -- I could act almost, almost as if I am an unrestricted trustee.
> Q:  All right.
> A: The only times the trustee . . . has certain responsibilities that I don't, either as a restricted trustee or as investment advisor, [is] when it comes to the assets of the trust, loans, and distributions, or the exclusive right of the unrestricted trustee, as I understand it from my trust attorneys.

(*Id.* at 639:10–640:6.)

The Debtor does not dispute that the Trust requires him, in his capacity as investment advisor, to provide instructions in writing to Labus, the unrestricted co-trustee, before Labus can execute or otherwise follow through with an investment of the assets of the Trust. Indeed, the Trust provides that the investment advisor must give "written instructions" to the trustee regarding an investment decision and the trustee is then required to execute the transaction. (Ex. A, Art. VII

9

§ 1.) Labus admitted at trial, however, that the Debtor would *not* give him written instructions in connection with investments. In response to the Court's attempt to clarify his position in this regard, Labus testified as follows:

Q: The question was, if [the Debtor] wanted to make an investment, he would give you written instructions. Your answer is –
A: No.
Q: No, right?
A: Right.

(Tr. 1 at 111:21–112:2.) Rather, Labus said, the Debtor would generally provide him with oral directions regarding potential Trust investments, and then they would follow up in writing. (*Id.* at 58:13–59:4.) Labus conceded that such writing was, at best, some sort of accounting notation. (*Id.* at 60:8–61:11 ("[W]e agreed that [the transaction] would be ratified by putting it into the accounting for the Trust.").) According to Tortorich, it is improper for a trustee to act on an oral direction of the investment advisor. (Tr. 3 at 682:10–12.) Harris, the estate planning attorney for both the Debtor and the Trust, also testified about the "written instructions" requirement, noting that he is "a firm believer in the documentation of trustee actions" and that, contrary to Labus's testimony, he never advised Labus that he did not need to document decisions that he makes as a trustee.[11] (Tr. 4 at 781:10–16.)

### Specific Loans and Transfers

Over the course of many years, the Debtor made various disbursements from the Trust and caused the Trust to make numerous transfers to him or to his Revocable Trust.[12] Labus testified that all of these disbursements were made as "loans" in order to protect the funds from the Debtor's

---

[11] When asked "which specific attorney told him that he "could disregard the provision of the Trust that required prior written instruction[s]," Labus said that it was "Chuck Harris from Katten Muchin. He directed how we were to do this, and he was well aware of it." (Tr. 1 at 109:15–110:10.)

[12] The James Samatas Revocable Trust (the "Revocable Trust") was created under a trust agreement dated May 6, 1997. (*See* Bankr. No. 20 B 17355, Dkt. 60 at 6.) The Revocable Trust is a self-settled trust. (*See id.*, Dkt. 37; Ex. C at 10.) The Debtor is the grantor, the trustee, and the beneficiary of the Revocable Trust. (*Id.*)

creditors, including his ex-wife. (Tr. 1 at 66:4–25.) According to Labus, the loans were made with no promissory notes or other documentation but as "open account balance" accounting entries. (*Id.* at 88:2–15, 89:16–19.) Labus further testified that the open account loan, which began in 2010, ultimately exceeded $19 million and that some of the disbursements were given to the Debtor to pay his personal expenses. (*Id.* at 67:17–75:10; *see also* Tr. 2 at 438:24–439:3.) The loan balance was "forgiven" by the Trust in tax year 2023, Labus said, when the Trust debited the $19 million as a distribution to the Debtor. (Tr. 1 at 70:5–71:11, 73:7–75:10.)

The Debtor's testimony was inconsistent with Labus's. Specifically, the Debtor testified that the funds he received from the Trust for his living expenses did *not* constitute loans; rather, he said, he was provided with those funds by virtue of the terms of the Trust. (Tr. 3 at 549:3–6 ("I have relied on the Trust agreement to receive [those] funds for living expenses"; they "do not constitute a loan.").) According to the Debtor, these expenses totaled $5,000 to $10,000 per month. (*Id.* at 548:4–552:1.) No documentation of any kind related to either these disbursements or the "forgiveness" of the $19 million "loan" was produced in the Debtor's bankruptcy case or this adversary proceeding.

In contrast, there *was* documentation produced at trial of a $10 million transaction (the "Revolving Loan") executed on January 1, 2000, by the Debtor, in his capacity as trustee of his Revocable Trust. (Ex. N.) According to the Debtor, he was "making very good money" at the time and wanted to "enjoy the fruits of [his] labor" by buying "collectibles . . . that could appreciate in value." (Tr. 2 at 440:19–441:12.) Thus, the Debtor said, he took out what he characterized as a $10 million "line of credit" to obtain various items of personal property, which he planned to purchase "over a period of time."[13] (*Id.* at 441:13–15.)

---

[13] The testimony regarding the various loans to the Debtor and/or his Revocable Trust was unclear and inconsistent. Labus initially testified that the $19 million "open account" loan did not include the $10 million

11

The Demand Note for the Revolving Loan provides that the Debtor's Revocable Trust promised to pay his Discretionary Trust "the unpaid principal balance," "on demand or on acceleration," as set forth on a schedule—Schedule A—attached to the note. (Ex. N.) That schedule, however, was never filled out. (Dkt. 138 ¶¶ 29–31). Nevertheless, the Debtor suggested that Labus kept records regarding the $10 million loan and the repayment thereof:

> Q: Do you know how drawdowns and repayments were tracked?
> A: Yeah, a hundred percent. . . . [W]e didn't physically use Exhibit A or B on the note. . . . [I]f there was money taken, [Labus] saw all the accounts, every year, every month, because he did my tax returns. . . . [R]ecords are partially the bank statements, and then how [Labus] took them from the bank statements and made . . . accounting book entries to reflect what was the balance on the loan.

(Tr. 2 at 452:19–453:13.) Despite this testimony, no accounting books or records were ever produced by Labus, his accounting firm, or the Debtor in the bankruptcy case or this adversary proceeding,

The expert witnesses for both the Trustee and the Defendants testified at trial about the importance of keeping records and their concerns about the lack of supporting documentation. Fitzgerald testified that a "fundamental fiduciary responsibility" of a trustee is to maintain adequate records and that the evidence in this matter demonstrated a complete failure in meeting that responsibility by both Labus and the Debtor. (*Id.* at 311:1–312:8.) In reviewing the Revolving Loan documents, in particular, he acknowledged that there were never any entries made in the attached schedules and asserted that the Debtor's and Labus's failure to maintain records regarding disbursements and payments was "dramatically inconsistent with custom and practice in the

---

Revolving Loan. (Tr. 1 at 72:13–16.) Subsequently, he said that the Revolving Loan was part of the $19 million in loans that were forgiven and thus reclassified as a distribution in 2023. (Tr. 2 at 256:24–257:20.) The Debtor, on the other hand, testified that the Revolving Loan for the purchase of the personal property was completely different from the later loans made to him or his Revocable Trust to cover his living costs and other expenses. (*Id.* at 438:24–439:18.)

industry." (*Id.* at 313:9–314:16.) Tortorich also testified that a lack of documentation, among other things, was a serious concern for the Trust. (Tr. 3 at 722:15–20.)

**Transfers and Sales of Personal Property**

**1. Transfers of Personal Property to the Trust**

The Debtor testified that he transferred a substantial amount of his assets to the Trust on July 3, 2018, purportedly as repayment for certain amounts that he owed to the Trust. (Dkt. 80 ¶ 19.) These assets consisted of artwork, paperweights, jewelry, and furniture (the "Personal Property") and were physically located, at all relevant times, both before and after the alleged transfer to the Trust, at the Debtor's home in Oak Brook, Illinois. (*Id.*) The Trustee was never provided with an itemized list of those items owned personally by the Debtor and the ones owned by the Trust. Likewise, no such ownership list was ever included as part of the Debtor's bankruptcy disclosures. (*See* Bankr. Dkts. 1, 20, 21, 22, 60, 61, 63.[14])

The Debtor testified at trial about two documents that he prepared regarding the transfer of the Personal Property (the "Transfer"), both dated July 3, 2018: (1) an untitled transfer document (the "Transfer Document") (Ex. D), and (2) a bill of sale (the "Bill of Sale") (Ex. E). The documents were executed by the Debtor both in his capacity as trustee of his Discretionary Trust and in his capacity as trustee of his Revocable Trust. (Exs. D, E; Dkt. 138 ¶ 19.)

According to the Transfer Document, the Revocable Trust agreed "to reduce the amount owed to the . . . Discretionary Trust by paying in kind personal property," and the Discretionary Trust accepted the payment "in lieu of cash." (Ex. D.) The Transfer Document further provides that "[t]he value [of the Personal Property] shall be determined from the original purchase price of

---

[14] All docket references to "Bankr. Dkt. __" are to the Debtor's bankruptcy case, Bankr. No. 20 B 17355.

said items, increased/decreased by estimate market value and subject to final price realized at [the]

time of sale by the . . . Discretionary Trust." (*Id.*)

In contrast, the Bill of Sale contains more detail and provides, in its entirety, as follows:

> This Bill of Sale is made between the James Samatas Revocable Trust (Revocable Trust) and the James Samatas Discretionary Trust (Discretionary Trust) for personal property as defined herein. The parties acknowledge the existence of a Line of Credit issued by the Discretionary Trust in favor of the Revocable Trust for the purpose of purchasing personal property. As of the date below [(July 3, 2018)], the Revocable Trust borrowed the full amount as provided for in the Line of Credit and an outstanding balance is due.
>
> The Discretionary Trust is willing to accept from Revocable Trust, in lieu of cash payment, personal property in return for reduction of the indebtedness. Both parties recognize that the value of personal property to be transferred is difficult to ascertain due to market conditions, nature of the property and timing of liquidation. Accordingly, based on available information, the value acceptable to both parties is $ 3 M and shall be applied to the Line of Credit as a reduction of amounts owed by the Revocable Trust. Title, possession and all rights pursuant thereto to the identified personal property shall immediately hereafter reside with the Discretionary Trust.
>
> The personal property subject to this Bill of Sale is generally identified as Artwork, Paperweights, Pens, Jewelry, Furniture, Fixtures and Miscellaneous artifacts. Primary vendors of stated personal property inventory are as follows:
>
> Artwork: RS Johnson—two paintings
> Paperweights: LH Selman—all paperweights as identified by inventory provided by the vendor
> Pens: Miscellaneous vendors of modern and vintage pens and ink bottles
> Jewelry: Miscellaneous vendors of opals, colored gemstones and several watches
> Furniture: Miscellaneous vendors of vintage and antique furniture, fixtures and residential artifacts located at 9 Natoma Drive, Oak Brook, Illinois.

(Ex E.)

The Defendants' testimony was inconsistent as to the timing of the execution of the Bill of

Sale. Labus testified that he first saw the Bill of Sale when the Debtor signed it on or around July

14

3, 2018 (Tr. 1 at 209:15–17.). The Debtor testified, however, that, prior to filing his bankruptcy case in September 2020, he never provided a copy of the Bill of Sale or the Transfer Document to anyone, including Labus. (Tr. 3 at 540:3–15, 645:17–646:1.)

As for the status of the Personal Property that was transferred, Labus testified that the Debtor maintained the same control over that property after the Transfer that he had prior to the Transfer. (Tr. 1 at 160:4–8 (acknowledging that, except for the transfer of ownership, "nothing else changed vis-à-vis the paperweights before and after they became part of the Discretionary Trust").) He also conceded that he did not take an inventory of the assets that were transferred, nor did he keep any inventory of the Trust assets on an ongoing basis. (*Id*. at 159:18–20, 161:19–162:6.) According to Labus, he knew about the details or sale of any of the items of Personal Property only if the Debtor provided him with the relevant information. (*Id*. at 178:15–23.)

Fitzpatrick testified that Labus's fundamental obligation as trustee is to secure and protect the assets entrusted to him. (Tr. 2 at 306:3–9.) In order to fulfill that duty, he said, the trustee must know what those assets are. (*Id.* at 306:9–10.) According to Fitzpatrick, "it would be the custom and practice in the industry to have a very clear inventory of those items so that you could identify that which is in the trust and that which is not in the trust." (*Id.* at 306:14–18.) "[A]nother very significant principle in the fiduciary world," he said, is "a prohibition on a trustee's commingling assets of the trust with assets of others, including the personal." (*Id.* at 306:19–22.) "It would be extraordinarily difficult to satisfy that obligation," Fitzpatrick explained, "if you did not know and could not identify and could not segregate those assets which were part of the trust versus those which were" not. (*Id.* at 306:23–307:1.)

Based on his understanding of the totality of the evidence, Fitzpatrick found that Labus did not keep a detailed list of the Trust's Personal Property, commingled the Property by allowing it to be kept in the Debtor's home, and permitted the insurance for the Personal Property to name only the Debtor

15

as loss payee. (*Id*. at 307:2– 308:12, 310:13–22.) As such, Fitzpatrick concluded, Labus's actions—and inactions—were "highly inconsistent with custom and practice of [a] fiduciary," and Labus essentially relinquished his responsibilities as trustee. (*Id*. at 308:8–12, 310:13–22.)

Prior to the Transfer of the Personal Property in July 2018, the Debtor and his Revocable and Discretionary Trusts were either sued or threatened with litigation in connection with various lawsuits. The Discretionary Trust of his brother John Samatas demanded payment from the Debtor in connection with a promissory note from John's Trust to the Debtor's Trust and subsequently, when the Debtor did not pay, filed a breach of contract action against both the Debtor and the Trust. (*See* Claims Register, Claim #21-1.) The Cohen & Lord law firm filed a counterclaim against the Debtor and the Trust, seeking attorney's fees in excess of $4 million. (*See id.*, Claim #30-1.) And from 2014 to 2018, the Debtor was embroiled in a divorce proceeding with his ex-spouse; the judgment in that case was entered by the Superior Court of California on July 2, 2018, just one day before the Transfer of the Personal Property. (Dkt. 138 ¶ 23.)

### 2. Sale of Personal Property

On July 20, 2018, approximately two weeks after the Transfer of the Personal Property, the Debtor entered into a consignment agreement in his own name with R.S. Johnson, a fine arts dealer. (Ex. L.) The agreement provided that various items, including three pieces by Picasso, had been "consigned to RS Johnson International Gallery Inc[.] by Jim Samatas for possible sale." (*Id.*) The agreement was signed by the Debtor in his individual capacity, with no mention that any of the artwork was owned by the Trust. (*Id.*) The Debtor testified that he entered into the consignment agreement as the investment advisor. (Tr. 3 at 650:25–651:2.) In each instance when a piece of artwork was sold, the check for the sales proceeds was made out to the Debtor alone and deposited into his personal bank account or that of his Revocable Trust. Specifically:

- On February 7, 2019, R.S. Johnson sold an oil painting by Jean Metzinger for $235,000. On the same day, R.S. Johnson wrote a check to the Debtor for $100,000. On April 17, 2019, R.S. Johnson wrote a second check to the Debtor for the remaining $135,000. The Debtor deposited both checks into his individual account at Citibank. (Dkt. 138 ¶ 27.)

- On November 25, 2019, R.S. Johnson sold a Giovanni Battista Piranesi etching for $7,500. The same day. R.S. Johnson wrote a check to the Debtor for that amount, and the Debtor deposited the check into his Bank of America Revocable Trust account. (*Id.* ¶ 28.)

- On December 10, 2019, R.S. Johnson sold a Picasso for $65,000. The check for the sales proceeds was made payable to the Debtor individually, and the Debtor deposited the funds from the sale into his Revocable Trust account at Bank of America. (*Id.* ¶ 26.)

No evidence was presented at trial to establish that any transfers were ever made by the Debtor or his Revocable Trust to the Discretionary Trust for these sales or any others.

Similarly, the Debtor, in his individual capacity, entered into various agreements with L. H. Selman Ltd. to sell certain paperweights owned by the Trust. The agreements referred to and/or were signed by the Debtor individually, without any mention that the items were Trust assets. (*See* Exs. U, V, W.) In fact, the Debtor himself represented in those agreements that he personally owned the paperweights. (*Id.*)  In January 2020, one of the paperweights was sold for a net price of $110,700, and the Debtor directed L. H. Selman to "please tender payment and make the check payable to Daniel Thiem," the Debtor's nephew. (Ex. EE; Tr. 1 at 176:19–177:1.) Labus did not pre-approve either the sale of the paperweights or the distribution of the sales proceeds to Thiem. (Tr. 1 at 178:3–8.)

Fitzpatrick testified that the way the Personal Property was sold was "highly inconsistent" with industry standards. (Tr. 2 at 332:12–333:3.)

**Trust Bank Accounts**

Since its inception, the Trust has had numerous bank accounts. (Dkt. 138 ¶¶ 39, 42, 46; Tr. 2 at 300:12–19.) On some of those accounts, the Debtor was the only signatory. (Dkt. 138 ¶ 39.) As the sole signatory, the Debtor was able to transfer funds out of these accounts without obtaining Labus's signature or authorization. (*Id.* ¶ 40.) Labus was not an authorized signatory on any of the Trust's bank accounts; as co-trustee of the Trust, he never wrote a check, withdrew money, or transferred funds from any of the accounts, and he did not receive copies from the bank of any of the related statements. (*Id.* ¶¶ 41, 42, 44; Tr. 1 at 37:23–37:20, 127:1–15, 134:14–135:2.)

The two bank accounts relevant to the matter at bar—a checking account and a money market account—were opened in the name of the Trust at BMO Harris Bank ("BMO") in January 2021. (Dkt. 138 ¶ 42; Exs. JJ, KK; Tr. 2 at 457:13–19, 460:11–20.) The Debtor's name was printed at the top of the checks, and there was no reference at all to the Trust. (Dkt. 138 ¶ 42.) Labus was not the signatory on either of the accounts. (*Id.*) The Debtor testified that the accounts were established so that he would have a place to deposit anticipated funds from the liquidation of certain Trust holdings, including Oxford Bank stock.  (Tr. 2 at 457:13–458:16.) After they were opened, the Debtor wrote checks and used funds from the accounts. (Dkt. 138 ¶ 43.) To pay his living expenses, including charges for Amazon, groceries, gasoline, and pet supplies, the Debtor used a debit card that was linked to one of the accounts. (*Id.*)

At trial, Labus and the Debtor were shown Trust bank statements and asked about many transfers of funds—both into and out of the accounts and, in particular, to the Debtor—as well as the process by which those transfers were made and approved. Labus did not have any specific recollection of any of the transfers, indicating that he "would have to go back into the accounting records" in order to remember discussions that took place prior to any given transfer. (Tr. 1 at 130:10–131:8.) Likewise, in response to questions from the Court, Labus testified that he did not

18

recall the transfers and would not be able to answer questions about them without looking back at

his records:

> Q: This is the statement, 8-26-21 to 9-25-2021. I'm looking here, and I see
>    there are deposits of $100,000. Where are the deposits coming from?
> A:  I don't recall offhand. I mean, you're asking me questions that I don't
>    know without looking back at records.
> Q: And what records would those be?
> A: The accounting records for the Trust.
> Q: And where would those accounting records come from?
> A: The accounting firm.
> Q: At your accounting firm?
> A: My accounting firm.
> Q: But you did not produce any of these?
> A: No.

(*Id.* at 143:6–24.)

### The Guaranty of Personal Debts by the Trust

On or around August 15, 2021, the Debtor, in his capacity as the trustee of the Trust,

executed a "Guaranty" on behalf of the Trust in favor of Parker Mills, LLP, counsel for the Debtor

in an action pending in California. (Dkt. 138 ¶ 37; Ex. P.) Pursuant to that document, the Trust

guaranteed the Debtor's unpaid obligation to Parker Mills in connection with a loan made to his

Revocable Trust in May 2020 in the amount of $150,000. (*Id.*; Tr. 1 at 226:12–24, 228:11–229:4.)

To secure the obligation under the Guaranty, the Debtor in his capacity as co-trustee of the Trust,

executed a Stock Pledge Agreement in favor of Parker Mills whereby the Trust pledged its interest

in shares of stock of Oxford Financial Corporation. (Dkt. 138 ¶ 38.) Labus testified that the

decision to have the Trust guarantee the Parker Mills obligation was made jointly with the advice

of counsel, including Chuck Harris. (Tr. 1 at 227:14–23, 229:13–230:2.) Harris testified, however,

that he had no familiarity with the transaction, was not consulted about it, and never advised the

trustees to have the Trust guarantee any personal obligations of the Debtor. (Tr. 4 at 780:12-21.)

### The Debtor's Cash "Contributions" to the Trust

19

The Trustee alleges that the Debtor made certain cash "contributions" to the Trust and suggests that, as a result, the Trust is now at least partially self-settled. (Dkt. 158 at 23–24.) The first such contribution relates to a loan that was made in 2010. (Tr. 1 at 94:25–95:3.) At that time, the Debtor was seeking to fund the purchase of a home on Tanager Way in Los Angeles, California. (*Id.* at 95:4–8; *see also* Tr. 2 at 445:24–446:5.) In order to buy that property, the Trust borrowed $6 million from the discretionary trust of John Samatas ("John's Trust"), the Debtor's brother. (Tr. 1 at 94:25–95:1) The Trust then immediately transferred those funds to the Debtor's Revocable Trust so that the Debtor could purchase the home. (*Id.* at 84:17-85:1, 95:4–8.) Subsequently, in 2012, $2 million of the $6 million that the Trust had borrowed from John's Trust was repaid by the Debtor's Revocable Trust to John's Trust. (*Id.* at 93:15–20, 95:9–17; Tr. 2 at 446:6–14.) According to Labus, the transaction was recorded as "a contribution to [the Debtor's Discretionary] Trust and then a payment to John for his trust." (*Id.* at 97:23–25.)

Second, on January 21, 2021, the Debtor deposited $100,000 into the Trust's BMO account. (Ex. JJ at 1.) The Debtor testified at trial that he "ha[d] no idea" as to the source of those funds but asserted that they did not come from the Oxford Bank transaction, which did not take place until 2022. (Tr. 3 at 658:12–659:1.) Subsequently, in September 2021, the Debtor deposited an additional $100,000 into the BMO Trust Account. (Ex. KK at 1.) No evidence was presented as to the origin those funds. The two deposits into the Trust's BMO accounts in the aggregate amount of $200,000 were made at a time when, the Debtor testified, he was "struggling" financially. (Tr. 2 at 456:19–457:12, 458:17–22.)

### The Proceedings in Bankruptcy

### 1. The Chapter 11 Filing

20

On September 21, 2020, the Debtor filed a voluntary *pro se* petition for relief under chapter 11 of the Bankruptcy Code.[15] (Bankr. Dkt. 1.) The bankruptcy case was filed one day before a scheduled foreclosure sale of the Debtor's Tanager Way property in Los Angeles. (Bankr. Dkt. 159 at 18:7–12.) In his initial bankruptcy schedules D and E/F filed with the chapter 11 petition, the Debtor did not list the Trust as one of his creditors. (*See* Bankr. Dkt. 1.) Neither a Statement of Financial Affairs ("SOFA") nor any schedules of assets were filed with his petition. (*See id.*) At his 341 meeting of creditors on October 22, 2020, the Debtor testified about the Trust and indicated that the only assets in the Trust were various interests in corporations, partnerships, and LLCs. (Bankr. Dkt. 37, Ex. C at 21:20–23:2.[16])

On November 2, 2020, the Debtor, again in a *pro se* capacity, filed his SOFA, a Statement of Current Monthly Income, and the balance of his schedules. (Bankr. Dkts. 20–22.) In response to Question 18 in his SOFA—"Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of business or financial affairs?"—the Debtor checked the "No" box. (Bankr. Dkt. 20 at 8.) Similarly, the Debtor checked the "No" box in answering Question 19—"Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are beneficiary?" (*Id.* at 9.)

---

[15] The Debtor filed the bankruptcy petition himself. Although he is an attorney, who was licensed in the State of Illinois in 1979, the Debtor's law license has been in inactive status since 2009. (Dkt. 138 ¶ 6.)

[16] Although it does not maintain written transcripts of its 341 meetings, the United States Trustee maintains official audio recordings of the sessions. In the context of filing a motion in 2020 to convert the Debtor's case to a case under chapter 7, counsel for the Debtor's former wife had written transcripts prepared of two sessions of the Debtor's meeting of creditors and attached them to a declaration attesting that the documents were accurate transcriptions of those two meetings. (Bankr. Dkt. 37 ¶¶ 4 and 5.) No party in either the bankruptcy case or this adversary proceeding has ever questioned the accuracy of those transcripts. (Bankr. Dkt. 159 at 15:19–21.)

In his Statement of Currently Monthly Income, the Debtor indicated that he had no income. (Bankr. Dkt. 21.) As for real property, the Debtor listed his residence in Oak Brook, Illinois and his home on Tanager Way in Los Angeles on his schedule A/B. (Bankr. Dkt. 22 at 1–2.) He indicated that both properties were owned by him personally in fee simple.[17] The Debtor did not include his ownership in either the Revocable Trust or the Discretionary Trust on schedule A/B. (*See id.*) Part 7 of the schedule, which asks the Debtor to "Describe All Property You Own or Have an Interest in That You Did Not List Above," was left blank by the Debtor. (*Id.* at 10.)

On November 19, 2020, at the second session of his 341 meeting, the Debtor testified that he owed money to the Trust, although he could not confirm the amount. (Bankr. Dkt. 37, Ex. D at 60.) When asked why the debt that he owed to the Trust was not listed on his bankruptcy schedules, the Debtor responded, "Because I treated it as one and the same, almost. It's my . . . alter ego." (*Id.*; Tr. 3 at 498:5–25.)

On January 7, 2021, counsel Ariel Weissberg filed an appearance on behalf of the Debtor in his chapter 11 case. (Bankr. Dkt. 43.) Shortly thereafter, on January 20, 2021, the Debtor filed amended schedules and an amended SOFA. (Bankr. Dkts. 60, 61, 63.) On his amended schedule A/B, he indicated that his home on Tanager Way in Los Angeles was owned in fee simple by his Revocable Trust, not by him personally. (Bankr. Dkt. 60 at 2.) Also on that schedule, he listed, among other things, $100,000 in household goods and furnishings; $200,000 for paperweights and artwork (but with no detailed description of the items); and $25,000 for six watches. (*Id.* at 3–4.) In addition, the Debtor included both his Discretionary Trust and his Revocable Trust on line 25 which asked for information about "[t]rusts, equitable or future interests in property (other than anything listed in line 1), and rights of powers exercisable for your benefit." (*Id.* at 6.) In response

---

[17]  At trial, the Debtor testified that the Oak Brook home is owned by an Illinois land trust and that he is the beneficiary of that trust. (Tr. 3 at 605:21–606:13.)

to line 44 asking about "[a]ny business-related property you did not already list," he specified the

Trust's interest in ten different nursing home properties. (*Id.* at 9.)

On his amended schedule E/F, the Debtor listed for the first time the Trust as an unsecured

creditor with a claim of $7 million for "[l]oans" incurred in 2005. (Bankr. Dkt. 61 at 7.) He also

included his brother John and his sister Cynthia for the first time as unsecured creditors with

disputed claims in unknown amounts. (*Id.* at 6, 7.) The $19 million "open account" loan owed by

the Debtor or his Revocable Trust to the Discretionary Trust about which Labus testified and which

was apparently outstanding at the time that the bankruptcy case was filed was not listed on either

the originally-filed or the amended SOFA or schedules. (*See* Tr. 1 at 67:17–68:13, 71:10–13,

74:8–76:1.)

Finally, in response to Question 18 on his amended SOFA, the Debtor indicated, among

other things, that on July 29, 2018, he transferred $3,000,000 worth of "[p]aperweights and

artwork" to the Trust as "repayment of loan." (Bankr. Dkt. 63 at 6.) Similarly, for Question 19, he

again stated that he transferred "paperweights and artwork" valued at $3,000,000 to the Trust on

July 29, 2018.[18] (*Id.*) The amended SOFA does not include information about the transfer to the

Trust of any furniture, fixtures, antiques, pens, jewelry, or gemstones.

The Debtor posits that none of the Trust assets are property of his bankruptcy estate. (Dkt.

138 ¶ 18.) He concedes, however, that the assets of his Revocable Trust constitute property of the

estate. (Tr. 3 at 609:11–15, 610:8–12.) When asked at trial why he disclosed the Trust's ownership

of interests in several entities that owned and operated skilled care facilities and other financial

holdings but did not disclose the Trust's ownership of the Personal Property that he or his

---

[18] The date of the Transfer on the Bill of Sale and Transfer Document (July 3, 2018) differs from the date reflected on the amended SOFA (July 29, 2018). (Exs. D, E; Bankr. Dkt. 63 at 6.)

Revocable Trust had transferred to the Trust, the Debtor testified that he forgot. (*Id.* at 629:11–19.)

## 2. Conversion of the Chapter 11 Case to a Case Under Chapter 7

On March 8, 2021, the Debtor's chapter 11 case was converted to a case under Chapter 7, and the Trustee was appointed thereafter. (Bankr. Dkts. 103, 105.) Bankruptcy Judge A. Benjamin Goldgar found "cause" to convert the case for two primary reasons: (1) the Debtor's unexcused failure to timely file monthly operating reports, Rule 2015.3 reports, schedules, and a SOFA; and (2) the Debtor's bad faith in filing his chapter 11 case. (Dkt. 159 at 29:11–30:3.) In addition to finding that the required documents were not timely filed, Judge Goldgar noted that the documents were also "grossly inaccurate." (*Id.* at 19:25–21:3 (detailing the many inaccuracies).)

Describing the Debtor's case as a "classic bad faith" filing, "patently abusive," and "a litigation tactic to gain the benefit of the automatic stay" (*id.* at 31:1–21), Judge Goldgar stated as follows:

> [The Debtor's] admitted purpose in filing [was] to delay creditors, particularly Carlye [his former wife], so that he can sell the West Hollywood property[19] himself rather than allow her to sell it at foreclosure. True, [the Debtor's] goal is to maximize the property's value. . . . But, even if true, he has no intention of using the proceeds to pay anyone other than certain secured creditors. Whatever else the sale produces will go to pay his daily expenses and fuel his litigation campaign against Cohen & Lord, his siblings and even Carlye. Other secured creditors and his unsecured creditors will get nothing. Once the property is sold, [the Debtor] will have achieved his purpose and expects to dismiss the case. He has no interest in confirming a plan.

(*Id.* at 31:2–17.) Putting the Debtor's "subjective intent aside," Judge Goldgar found that "his behavior to date shows creditors can't trust him to administer the bankruptcy estate for their benefit." (*Id.* at 34:8–10.)

---

[19] The "West Hollywood property" is the Debtor's former home on Tanager Way in Los Angeles.

24

### 3. Waiver of the Trust's Bankruptcy Claim Against the Debtor's Estate

On July 20, 2021, the Debtor filed a waiver of claim (the "Waiver of Claim") for the Trust in his bankruptcy case. (Bankr. Dkt. 183; Ex. O.) Pursuant to the document, which was executed by the Debtor, in his capacity as trustee of the Trust, on July 14, 2021, the Trust waived "any claims that [it] ha[d] or may have had against" the Debtor's bankruptcy estate. (Ex. O; Dkt. 138 ¶ 35.) As a result, the Trust would not "be filing any Proofs of Claim in [the] case," nor "asserting any rights to receive funds or other property in [the] bankruptcy case as a pre-petition creditor," even if the bankruptcy estate was "a surplus estate." (Ex. O; Dkt. 138 ¶ 36.) At that time, the balance owed on the $19 million "open account" loan from the Trust to the Debtor or his Revocable Trust was still due and owing.

Although the Waiver of Claim was signed by the Debtor as trustee of the Trust, he testified that the decision to execute the document was made in his capacity as investment advisor:

> Q: I just want to be crystal clear that you did this as the investment advisor as opposed to as the co-trustee.
> A: So I'm opaque clear, yes.
> Q: Okay. And . . . if you did it as the investment advisor, Mr. Labus had no say in it, because he as the . . . unrestricted trustee had to follow any instruction you gave him as the investment advisor, correct?
> A:  Correct.
> Q: And you're not in any way suggesting that there was something not authorized regarding the Discretionary Trust filing this waiver of claim, correct?
> A: Correct.

(Tr. 3 at 570:25–571:10.) According to the Debtor, then, he did not require Labus's approval to waive the claim by virtue of his position as investment advisor of the Trust. (*Id*. at 569:19–570-9.)

Labus said that he did not recall whether he signed off on the Waiver of Claim before the Debtor filed it in the bankruptcy case. (Tr. 1 at 218:11–13.) Rather, he testified that "[w]hatever was involved, Chuck Harris and Ariel [Weissberg] were involved. So whatever they recommended

25

is what I did." (*Id.* at 218:14–16.) Contrary to this testimony, Harris stated that he had no

knowledge of or involvement in connection with the Waiver of Claim:

> Q: There's been a discussion regarding a waiver of a claim in the bankruptcy and testimony from Mr. Labus about your involvement in that. Are you aware of a waiver of a claim by the Discretionary Trust in the bankruptcy?
> A: No, I'm not.
> Q: Were you consulted with respect to whether or not the Trust should or should not waive its claim in the bankruptcy?
> A: No, I was not consulted.
> Q: Did you give advice to either Mr. Labus or Mr. Samatas about that topic?
> A: No, I did not.[20]

 (Tr. 4 at 768:14–769:1.)

As to why the Trust waived its claim against the Debtor's bankruptcy estate, the Debtor

testified that "there probably would not be anything coming out of [the bankruptcy estate] is

the way I looked at it. . . . [I]t was maybe break-even for [a] proof of claim. We really weren't

losing anything by giving it up. It wasn't like a surplus estate that we were going to get lots of

money staying in there." (Tr. 2 at 472:7–13.) Labus testified in a similar way, noting that the

Debtor "was in bankruptcy" and that, "as a result, he may not ever be able to pay [back his

debt]." (Tr. 1 at 220:20–22.) The Debtor "was able to put himself in a different position as it

related to the bankruptcy," Labus said. (*Id.* at 220:23–25.) "[T]he bankruptcy estate was not

large enough, as I recall, to get the money back." (*Id.* at 221:7–8.)

### 4. This Adversary Proceeding

---

[20] In fact, contrary to the Debtor's and Labus's claims at trial, Harris testified that he was not consulted about and did not give advice to either the Debtor or Labus on a variety of matters, including: (1) the Transfer of the Personal Property from the Debtor or his Revocable Trust to his Discretionary Trust (Tr. 4 at 769:12–770:2); (2) repaying the Revolving Loan by transferring the Personal Property (*id.* at 770:3–10); (3) establishing Trust bank accounts and providing the Debtor with a debit card for such accounts (*id.* at 775:20–776:5); (4) having the Trust guarantee the Debtor's personal obligation to Parker Mills (*id.* at 780:12–21); (5) waiving the Trust's claim against the Debtor's bankruptcy estate (*id.* at 768:14–769:1); (6) responding to discovery requests in this adversary proceeding (*id.* at 769:2–11); and (7) treating the $19 million loan as a distribution (*id.* at 784:25–785:3).

26

On December 20, 2021, the Trustee commenced the instant adversary proceeding, seeking a determination of the bankruptcy estate's interest in the Trust, as well as avoidance and recovery of the Debtor's Transfer of the Personal Property to the Trust. (Dkt. 1.) The Trustee alleges in Count I of the complaint that the spendthrift language in the Trust is not effective because the Debtor has complete dominion and control over the Trust and its assets and that, accordingly, the Trust is property of the estate under section 541 of the Bankruptcy Code. In Count II, the Trustee argues, in the alternative, that the Trust is the alter ego of the Debtor because he has treated the property of the Trust as his own and has failed to observe Trust formalities. In Counts III, IV, and VI, the Trustee seeks avoidance and recovery of the allegedly fraudulent Transfer of the Personal Property made by the Debtor to the Trust. Finally, in Count V, the Trustee asks the Court to enjoin any transfer or encumbrance of Trust assets being held by the Debtor and/or Labus, pending a determination as to whether those assets are property of the bankruptcy estate.

On June 30, 2022, after the Defendants had filed a motion to dismiss the adversary proceeding and the parties had tried, without success, to settle their dispute, the Trustee filed an amended complaint.[21] (Dkt. 74.) The Defendants filed an answer to that complaint on July 27, 2022 (Dkt. 80), and the parties began engaging in discovery. On September 13, 2024, the Defendants' attorney in both the bankruptcy case and the adversary proceeding was given leave to withdraw as counsel (Dkt. 116), and the Debtor represented himself in the bankruptcy and the adversary during the months that followed. Trial counsel for the Defendants did not appear in this adversary proceeding until March 31, 2025. (Dkt. 126.)

---

[21] Unless otherwise noted, all references to the complaint that follow are to the subsequently-filed amended version.

On June 24, 2025, the adversary proceeding went to trial. At the conclusion of the proceedings, the Court asked the parties to submit post-trial briefs, as well as any appropriate post-trial motions in connection with issues on which the Court had either reserved decision or denied without prejudice. Upon the filing of those briefs and motions, the Court took the matter under advisement. Having conducted a careful and comprehensive review of the docket, the pleadings and attached exhibits, the trial transcript, the admitted exhibits, and the post-trial briefs and motions, the Court is now ready to rule.

## DISCUSSION

Before turning to the substantive issues in this adversary proceeding, the Court first addresses the two post-trial motions filed by the parties.

### The Trustee's Motion for Sanctions and Adverse Inferences

One of the primary issues raised by the adversary complaint at bar is whether the Trust is a legitimate spendthrift instrument or whether the Trust assets constitute property of the Debtor's bankruptcy estate. A key consideration in resolving that issue requires a review of the actions—or inactions—of the co-trustees of the Trust. Specifically, the Court must examine, among other things, whether the Debtor, a restricted co-trustee of the Trust, communicated with and sought the approval of Labus, the non-restricted co-trustee, regarding certain actions taken in connection with Trust assets, expenditures, transfers, and the incurrence and repayment of debt.

In September 2021, the Trustee issued subpoenas under Rule 2004 of the Federal Rules of Bankruptcy Procedure to examine both the Debtor and Labus. (Bankr. Dkt. 216, Ex. A; Dkt. 161, Exs. 1, 2.) The documents requested as part of the subpoenas included any and all written communications by and between any trustee of the Trust or the Debtor individually in any way related to: (1) the liquidation of any assets of the Trust; (2) the expenditure of funds in any bank accounts owned by the Trust; (3) the incurrence of any debt by the Trust; or (4) the repayment of

28

any loans from the Debtor or his Revocable Trust to his Discretionary Trust. (*Id.*) On November 8, 2021, after the Trustee had filed a Motion to Compel the Debtor and Labus to provide the documents requested in the subpoenas (Bankr. Dkt. 216), both the Debtor and Labus executed Affidavits of Completeness, stating that they had produced "all documents in [their] possession, dominion and control that [were] responsive to the Subpoena[s]" (Dkt. 161, Exs. 3, 4; Ex. BB).

Subsequently, when Labus took the position that certain documents were in his possession as accountant rather than as co-trustee of the Trust, the Trustee issued a subpoena for a Rule 2004 examination of Labus in his capacity as certified public accountant. (Dkt. 161, Ex. 5.) That subpoena requested, among other things, all written communications by and between Labus, individually or in his capacity as accountant for the Trust, or any accountant or employee of Labus's accounting firm Friedman and Huey (the "Accounting Firm"), and the Debtor in any way related to: (1) the liquidation of any assets of the Trust; (2) the expenditure of funds in any bank account owned by the Trust; (3) the incurrence of debt by the Trust; or (4) the repayment of any loans from the Debtor's Revocable Trust to the Trust. (*Id.*) On November 16, 2022, Labus, on behalf of the Accounting Firm, executed an Affidavit of Completeness, indicating that "the documents and other materials in his possession as required by such Subpoena and the Rider thereto" had been provided. (*Id.*, Ex. 6; Ex. WW.)

According to the Trustee, except for "certain limited materials," the Debtor, Labus, and the Accounting Firm failed to produce any of the documents requested in the Trustee's subpoenas. (Dkt. 161 ¶ 12.) The Defendants admitted that neither the Debtor nor Labus provided "any written communications whatsoever" between the two trustees which in any way related to the Trust. (Dkt. 80 ¶ 37.) Nevertheless, the Debtor and Labus testified at trial that such documents existed and

29

were maintained by them in various capacities. For example, Labus referred to notes which, he said, were in his files and could confirm that he had authorized the Debtor to sell Trust assets:

> Q: How would you go to find out if you had given authorization for the sale of any Discretionary Trust asset?
> A:  I would find out from notes in our files.
> Q: What kinds of notes did you keep in your files regarding your preapproval for the sale of Discretionary Trust assets?
> A:  I would have maybe jotted down something and discussed it with the people that are doing the bookkeeping.

(Tr. 1 at 148:12–21.)

When asked about authorizing sales of the Trust assets in general, Labus testified that he could not answer the question "without looking at the books and records of the Trust." (*Id.* at 149:14–150:4.) He acknowledged that the Trust required written instructions from the Debtor as investment advisor, but he maintained that the accounting records he prepared fulfilled that requirement. (*Id.* at 61:6–11.) He also testified that he gave the Debtor authorization to make payments from the Trust and that confirmation of his approval of those payments were in the records of the Trust:

> Q:  You testified earlier that for large bills . . . , $50,000 [or] more, you had to approve payment for those from the Discretionary Trust; did I understand that correct[ly]?
> A:  [The Debtor] would discuss them with me, yes.
> Q:  Okay, and the approval that you gave for those things to be paid out of the Discretionary Trust funds, that would be in your records, right?
> A:  Correct.
> Q:  That would be the same records we've talked about before that are housed at your accounting firm that you didn't produce, correct?
> A:  Correct.

(*Id.* at 189:25–190:12.)

None of the records that Labus testified he relied on to verify that his approval was sought and obtained by the Debtor were ever produced in this matter. Likewise, none of the accounting records that Labus repeatedly said that he or his firm created were produced. When asked why he

did not produce the documents, Labus first testified that his firm had not been subpoenaed. (*Id.* at 42:17–25.) Confronted at trial with a copy of the Accounting Firm subpoena and his Affidavit of Completeness, Labus, prompted by his attorney, then suggested that the documents were not produced because of the accountant-client privilege. (Tr. 2 at 285:5–286:9.) Despite that claim, neither the Accounting Firm nor Labus ever objected to the production of any documents in this matter based on the accountant-client or any other privilege. Thus, the subpoenas requesting the documents are not subject to the accountant-client privilege. *See, e.g., Chaikin v. Fid. & Guar. Life Ins. Co.*, No. 02 C 6596, 2003 WL 22715826, at *1 (N.D. Ill. Nov. 17, 2003) (finding that a "document production order was not subject to the accountant-client privilege" because the party objecting to the subpoenas at issue "failed to provide factual allegations to support the application of the privilege to any specific documents").

The Debtor feigned ignorance about the existence or production of relevant Trust documents and stated merely that he was not the accountant for the Trust and thus would not have the information. (Tr. 3 at 616:11–617:1.) Likewise, when discussing loans provided by the Trust and repayments of those loans by the Debtor or his Revocable Trust, the Debtor shifted the responsibility and accountability to Labus, asserting that he was the one who tracked all drawdowns and repayments. (Tr. 2 at 452:19–453:13.)

Because of the Defendants' failure to produce any of the documents on which they testified that they relied, the Trustee has moved for an adverse inference that those documents do not exist and that any testimony to the contrary must not be taken into consideration. (Dkt. 161.) Specifically, the Trustee requests that the Court impose the following adverse inferences against the Defendants by concluding that: (1) there were no written communications between the Debtor and Labus concerning the matters regarding the Trust which were requested in the subpoenas;

(2) there were no ledgers of loans between the Trust and the Debtor or his Revocable Trust; and (3) the Debtor made the decisions, and, thus, the Trust property was dissipated without the input of Labus as co-trustee. (*Id.* ¶ 28.)

In response to the Trustee's request for the imposition of adverse inferences, the Defendants argue that their trial attorneys were not retained until three months before the trial. (Dkt. 168.) For that reason, they say, their counsel had no knowledge of what occurred during the discovery stage of the proceedings.[22] (*Id.* ¶ 1.) The trial attorneys admit, however, that they reviewed and verified the factual allegations with respect to the discovery requested by the Trustee and the responses from the Defendants and "must in good faith acknowledge the accuracy of those allegations." (*Id.* ¶ 2.) The Defendants also concede that "a negative inference may be an appropriate sanction with respect to the existence of the documents not produced in response to the discovery requests based on the factual allegations" in the Trustee's Adverse Inferences Motion. (*Id.* ¶ 5.) They state, however, that they "strongly object" to imposition of an adverse inference that the Trust property was dissipated solely based on the Debtor's decisions, without input from Labus as co-trustee. (*Id.*) According to the Defendants, the failure to produce records does not itself infer that the Debtor did not communicate with Labus or that the Debtor dissipated Trust property. (*Id.*)

Based on a review of the evidence in this matter, the Court will impose the adverse inference that the documents about which the Defendants testified at trial—including any ledgers of loans between the Trust and the Debtor or his Revocable Trust—do not exist. Given this

---

[22] Although it is true that trial counsel did not appear for the Defendants in this adversary proceeding until three months before the commencement of the trial, those lawyers were not strangers to the Debtor or his case. In fact, in November 2020, trial counsel Scott Levin filed a proof of claim on behalf of Howard & Howard Attorneys PLLC regarding certain attorney's fees that were owed by the Debtor to the firm. (*See* Claims Registry, Claim #9-1.) Further, in March 2021, Levin filed an appearance in the Debtor's bankruptcy case on behalf of Howard & Howard, as well as an objection to the motion to convert the chapter 11 case to a case under chapter 7. (Bankr. Dkts. 101, 102.)

inference, the Court could also conclude that the property of the Trust was dissipated as a result of the Debtor's decisions alone, without any input from Labus. After all, Labus and the Debtor admitted at trial that they could not recall Labus specifically approving most of the questioned transactions and that the records referred to were needed in order to verify or corroborate the approvals. Nevertheless, the Court will decide whether to impose the adverse inference, or draw the conclusion from that inference, that the Trust assets were depleted due solely to the Debtor's decisions, without Labus's approval, not in the context of the Trustee's Adverse Inferences Motion but on the merits of the complaint as discussed *infra*.

In reaching its decision, the Court notes that it has serious concerns about the credibility of the testimony provided by both the Debtor and Labus. The Debtor's testimony was, time and again, evasive, inconsistent, and self-serving. When confronted with questions that he did not like, he routinely failed to provide direct answers and shifted his commentary from one version to another, depending on what he believed would benefit him the most. As discussed *supra*, in his discussion of the Debtor's chapter 11 filing, Judge Goldgar raised concerns about the Debtor's lack of good faith and credibility, emphasizing, among other things, his lack of respect for the lawyers in this case and for the bankruptcy system generally:

> [The Debtor] justifies his failure to file schedules and other materials on the ground[s] that (1) he intended to sell the West Hollywood property and didn't want to bother anyone with a lot of needless paperwork, and (2) although he has been a lawyer since 1979 and even practiced for a while, he didn't appreciate what he now calls the "sanctity of the bankruptcy system[.]" These aren't reasonable justifications. . . .
>
> He adds that he has been "deeply humbled" and has "corrected his attitude." As his "cure," he once more offers to file a confirmable plan and fund it. One might well question these assertions given [the Debtor's] testimony at his creditors meeting. He was anything but humble at the meeting, maligning the lawyers examining him, deriding their legal skills, even refusing to answer some questions.

33

(Bankr. Dkt. 159 at 36:13–21, 37:22–38:5 (internal citations omitted).)

The Debtor's deportment during the trial in this matter demonstrates that he continues to be the very opposite of "humble" and has by no means "corrected his attitude." Throughout the trial, he maligned and insulted the lawyers and their legal skills, often responded to questions with ferocious sarcasm, and continually changed his answers to serve his best interests.

Labus's credibility is equally concerning, warranting the Court's skepticism. As a result of his close, long-term relationship with the Debtor and his family,[23] Labus's motivation was in question from the outset. In addition, his testimony was typically self-serving, often contradictory, and seldom sound, particularly with respect to his and the Debtor's adherence to Trust requirements. Labus repeatedly testified that he was aware of and approved all Trust transactions, but there was no evidence to support his claim, and his testimony frequently conflicted with the Debtor's. It also became clear at trial that his testimony was sometimes less than accurate, such as when he testified: (1) that the subpoenas were not sent to his accounting firm; (2) that he saw the Bill of Sale in connection with the Transfer of the Personal Property; (3) that Harris was involved in particular decisions with respect to the Trust; and (4) that he received Trust bank statements on a monthly basis.

For all of the reasons above, the Court will grant in part the Trustee's Adverse Inferences Motion and will impose adverse inference against the Defendants by concluding that: (1) there were no written communications between the Debtor and Labus concerning liquidation of Trust assets, expenditure of Trust funds, incurrence of debt by the Debtor or his Revocable Trust, or

---

[23] The Debtor described the relationship between Labus and the Samatas family as "extremely intense and close" and one that "went far beyond your typical professional client relationship." (Tr. 2. at 418:9–16, 482:22–25.)

repayment of loans from the Debtor or his Revocable Trust to the Discretionary Trust; and

(2) there were no ledgers of loans between the Trust and the Debtor or his Revocable Trust.

**The Defendants' Requests for a Directed Finding on Counts I–IV of the Complaint**

At the conclusion of the Trustee's case, the Defendants presented to the Court, in writing

and orally, a request for a directed finding on Counts I and II of the complaint. The written request,

styled as a motion attached to the Defendants' post-trial brief, was never filed with the Court. (Dkt.

167, Ex. A.) Also after the Trustee concluded his case, the Defendants moved orally for a directed

finding on Counts III and IV of the complaint. (Tr. 2 at 409:22–411:21.) The Court found that the

directed finding requests raised both legal and factual issues, some of which, due to the procedural

posture of the case, had not previously been fully briefed or addressed.[24] (*Id.* at 407:6–11.) The

Court initially denied the directed finding requests without prejudice, directing the Defendants to

present their evidence at trial and stating that they could renew their requests for a directed finding

at the conclusion of the proceedings. (*Id.* at 409:14–21.) The Court further suggested that if the

Defendants wanted to raise the issues again, post-trial briefing and post-trial motions would likely

be necessary. (*Id.* at 412:5–12.)

At the conclusion of the trial, the Defendants expressed their desire to renew their directed

finding requests. (Tr. 4 at 795:6–10.) Accordingly, the Court set a post-trial briefing schedule

which included briefing on the requests. (*Id.* at 856:6–858:6; Dkt. 153.) In their post-trial brief

---

[24] On January 2, 2022, the lawyer acting on behalf of the Defendants at that time moved to dismiss Counts I, II, and V of the adversary complaint. (Dkt. 13.) On February 14, 2022, however, the parties moved in the Debtor's bankruptcy case to settle several matters; the proposed settlement included dismissal of Counts I, II, and V. (Bankr. Dkt. 272.) Because of the possibility of settlement, the parties never fully briefed the motion to dismiss. The motion to approve the settlement was withdrawn on June 20, 2022. (Bankr. Dkt. 352.) Subsequently, on June 30, 2022, the Trustee filed his amended complaint in the adversary proceeding. (Dkt. 74.) The Defendants did not move to dismiss the new complaint; rather, on July 27, 2022, they filed an answer. (Dkt. 80.) Many of the issues raised by the Defendants in their requests for a directed finding at the close of the Trustee's case-in-chief were asserted in the motion to dismiss from 2022 and are the type of issues ordinarily addressed in pretrial motion practice. Given what happened with respect to the potential settlement and the events that occurred thereafter, those issues were never addressed prior to the commencement of the trial.

(Dkt. 167), the Defendants set forth their requests for a directed finding on Counts I–IV but, contrary to the Court's directions and its post-trial scheduling order, they did not file a separate motion for a directed finding on those counts.

Based on the way the requests for a directed finding were raised, as well as the need to understand both the elements of the causes of action at issue and application of the relevant facts to those elements, the Court will address the Defendants' requests for a directed finding as part of its discussion on each of the relevant counts of the complaint.

### Count I: Determination That the Discretionary Trust Assets Are Property of the Bankruptcy Estate

In Count I of the complaint, the Trustee argues that the assets of the Trust are property of the bankruptcy estate pursuant to section 541 of the Bankruptcy Code. According to the Trustee, the Trust is not a valid spendthrift trust under Illinois law—and thus provides no protection of its assets from recovery by the Debtor's creditors—primarily because the Debtor has exclusive dominion and control over and unfettered access to the Trust's assets. The Defendants contend, in turn, that, based on the language of the instrument itself, the Trust is a valid spendthrift trust and that, accordingly, its assets are beyond the reach of the Debtor's creditors. As the party asserting the Trust's protections, the Defendants bear the burden to establish that the Trust is a valid spendthrift trust and, thus, that its assets are not property of the bankruptcy estate. *See, e.g., Hill v. Dobin*, 358 B.R. 130, 135 (D.N.J. 2006); *In re Foster*, 556 B.R. 233, 237 (Bankr. E.D. Va. 2016); *see also In re West*, 507 B.R. 252, 257–58 (Bankr. N.D. Ill. 2014).

Pursuant to section 541(a)(1) of the Bankruptcy Code, the commencement of a bankruptcy case creates an estate which is "comprised of . . . all legal or equitable interests of the debtor in property" as of the filing of the case. 11 U.S.C. § 541(a)(1); *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05 (1983) (noting that property of the bankruptcy estate is

36

"broad[ly]" defined in the Code). Property generally becomes part of the debtor's bankruptcy estate despite any restrictions placed on its transfer. 11 U.S.C. § 541(c)(1). Notwithstanding this general rule, section 541(c)(2) provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable." 11 U.S.C. § 541(c)(2); *see also Patterson v. Shumate*, 504 U.S. 753, 759 (1992) (explaining that "any relevant nonbankruptcy law," whether state or federal, satisfies the requirement). Although the language of the statute does not include any reference to the term "spendthrift," a review of the legislative history of section 541(c)(2) indicates that Congress enacted the provision in order to exclude spendthrift trusts from the debtor's bankruptcy estate. *In re Perkins*, 902 F.2d 1254, 1257 (7th Cir. 1990) (citing S. Rep. No. 95-989, 95th Cong., 2nd Sess. 83 (1978), *reprinted* in 1978 U.S.C.C.A.N. 5787, 5869; H.R. Rep. No. 95-595, 95th Cong., 2nd Sess. 369 (1977), *reprinted* in 1978 U.S.C.C.A.N. 5787, 5963, 6325)); *see also Christison v. Slane (In re Silldorff)*, 96 B.R. 859, 862–63 (C.D. Ill. 1989); *In re Dagnall*, 78 B.R. 531, 533–34 (Bankr. C.D. Ill. 1987).

Illinois law has long recognized the validity of spendthrift trusts.[25] *Johnson v. McCoy (In re McCoy)*, 274 B.R. 751, 762 (Bankr. N.D. Ill. 2002) (citing, *inter alia*, *Wagner v. Wagner*, 91 N.E. 66, 70 (Ill. 1910)); *see also Silldorff*, 96 B.R. at 864 (citing *Geiger v. Geer*, 69 N.E.2d 848, 379–80 (Ill. 1946)). "The purpose of a spendthrift trust is to provide money for the care and maintenance of another person while protecting the trust from the beneficiary's incapacity or financial imprudence." *Lunkes v. Gecker*, 427 B.R. 425, 429 (N.D. Ill. 2010); *see also Schechter v. Balay (In re Balay)*, 113 B.R. 429, 437 (Bankr. N.D. Ill. 1990); *Wagner,* 91 N.E. at 69–70 (explaining that spendthrift trusts "are created with a view of providing a fund for the maintenance

---

[25] The Trust at issue provides that the document "shall be construed and administered . . . in accordance with the laws of the State of Illinois." (Ex. A, Art. III.) The parties do not dispute that Illinois law governs the interpretation of the Trust in this matter and whether that instrument is a valid spendthrift trust. (Dkt. 138 ¶ 8.)

of another and[] at the same time securing it against his own improvidence or incapacity for self-protection"); Restatement (Third) of Trusts § 58 (2003) (noting that a "spendthrift trust" is designed to provide for the maintenance and support of a beneficiary while protecting the trust assets from both the beneficiary's financial irresponsibility and the claims of creditor). "Beneficial interests in a valid spendthrift trust are expressly excluded from the property of a debtor's bankruptcy estate." *In re Morris*, Case No. 21-30468, 2023 WL 186834, at \*4 (Bankr. S.D. Ill. Jan. 13, 2023); *see also Firestone v. Metro. Life Ins. Co. (In re Di Piazza),* 29 B.R. 916, 918 (Bankr. N.D. Ill. 1983). The benefits of a spendthrift trust, however, come at a cost, as such a trust restricts "a beneficiary's ability to alienate the trust assets." *Morris*, 2023 WL 186834, at \*4.

Illinois courts recognize and uphold spendthrift trusts even without express language or labels in the instrument. *See, e.g., Geiger,* 69 N.E.2d at 853; *Von Kesler v. Scully*, Gen. No. 35,795, 1932 WL 2600, at \*4 (Ill. App. Ct. Oct. 4, 1932). Although no particular language is required to create a spendthrift trust, *McCoy*, 274 B.R. at 762, "the settlor must manifest [his] intention in language which is clear and unequivocal," *Richardson v. McCullough (In re McCullough)*, 259 B.R. 509, 517 (Bankr. D.R.I. 2001).

To decide whether a trust qualifies as a spendthrift trust under Illinois law, courts must determine the following: (1) "whether the trust restricts the beneficiary's ability to alienate and the beneficiary's creditors' ability to attach the trust corpus"; (2) "whether the beneficiary settled and retained the right to revoke the trust"; and (3) "whether the beneficiary has exclusive and effective dominion and control over the trust corpus, distribution of the trust corpus and termination of the trust." *Perkins*, 902 F.2d at 1257 n.2. Thus, in order to be deemed a valid spendthrift trust under Illinois law, the Trust at issue must include an anti-alienation provision, "not be self-settled," and place the Trust property beyond the Debtor's control. *See id.*; *Balay,* 113 B.R. at 442 (citing *Di*

38

*Piazza*, 29 B.R. 916; *Gordon v. Reynolds,* 28 N.E. 455 (Ill. 1885); *Jones v. King,* 1877 WL 225 (Ill. Sep. 1, 1877); *Von Kesler v. Scully,* 1932 WL 2600 (Ill. App. Ct. Oct. 4, 1932)). The Court examines each of these elements in turn.

### 1. Anti-alienation provision

The hallmark of a spendthrift trust is its anti-alienation clause, which bars the beneficiary from assigning his interest and protects the trust assets from creditors until distribution. *See, e.g., Balay*, 113 B.R. at 437 (noting that spendthrift trusts "are distinguishable from other types of trusts by their provisions against alienation of the trust corpus by the voluntary or involuntary acts of their beneficiaries"); *Geiger,* 69 N.E.2d at 853. Accordingly, in order to be deemed a valid spendthrift trust under Illinois law, a trust must include, among other things, a provision restricting the beneficiary from alienating his interest therein and creditors from reaching the assets of the trust. *Silldorff*, 96 B.R. at 864; *Di Piazza*, 29 B.R. at 919 (explaining that the "provisions against alienation of the trust fund by the voluntary act of the beneficiary, or *in invitum* by his creditors, are usual incidents of such trusts" (internal quotation omitted)).

Article IX of the Trust in this matter contains a spendthrift provision, which, if enforceable, would exclude the Trust assets from the bankruptcy estate. (Ex. A, Art. IX.) Pursuant to the language of that provision, Article IX was clearly meant to restrict the beneficiary's ability to alienate the Trust assets and any creditor's ability to attach the Trust corpus.

In fact, the parties do not dispute that Article IX is an anti-alienation provision which, on its face, constitutes a customary spendthrift provision. Indeed, Fitzpatrick, the expert witness for the Trustee, conceded at trial that the provision is "pretty standard." (Tr. 2 at 378:14–19.) Thus, the first *Perkins* factor has been satisfied.

### 2. Settlement of the Trust

A self-settled trust is defined as "[a] trust created for a settlor's own benefit." *Dexia Credit Loc. v. Rogan*, 624 F. Supp. 2d 970, 976 (N.D. Ill. 2009). A spendthrift trust cannot be self-settled under Illinois law. *Lunkes*, 427 B.R. at 430; *Barber v. Simpson (In re Hawley)*, No. 02-83674, Adv. 03-8040, 2005 WL 330098, at *3 (Bankr. C.D. Ill. Feb. 20, 2004); *Balay*, 113 B.R. at 437 (noting that "courts invariably refuse to allow a settlor to create a trust for his own benefit that shields the trust corpus and its income from his creditors"). *See also Parkinson v. Bradford Tr. Co. of Boston (In re O'Brien)*, 50 B.R. 67, 76 (Bankr. E.D. Va. 1985) (explaining that, even in states where spendthrift trusts are permitted, a settlor cannot "so dispose of his property for his own use, benefit, or support, as to put it beyond the reach of liability for his future debts" (internal quotation omitted)), *overruled on other grounds, Patterson v. Shumate,* 504 U.S. 753 (1992); *Rush Univ. Med. Ctr. v. Sessions*, 980 N.E.2d 45, 52 (Ill. 2012) (emphasizing that "if a settlor creates a trust for the settler's own benefit and inserts a spendthrift clause, the clause is void as to the then-existing and future creditors, and creditors can reach the settlor's interest under the trust").

In this matter, the Defendants argue that, in addition to Illinois case law, section 2-1403 of the Illinois Code of Civil Procedure is the "applicable nonbankruptcy law" which restricts the transfer of the Debtor's beneficial interest in the Trust. 735 ILCS 5/2-1403. Section 2-1403 provides, in pertinent part, that no court "shall order the satisfaction of a judgment out of any property held in trust for the judgment debtor if such trust has, in good faith, been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor." *Id.* The provision speaks directly to the second *Perkins* element—whether the Debtor, as beneficiary, contributed funds to the Trust such that the Trust can no longer be considered self-settled. *See Dexia*, 624 F. Supp. 2d at 976 (citing 735 ILCS 5/2-1403 for the proposition that spendthrift trusts are valid under Illinois law "except when they have been created or funded by a judgment debtor").

40

Section 2-1403 "enforces spendthrift trusts by insulating trust assets from the demands of a beneficiary's creditors." *In re Hughes*, No. 18 B 11700, 2020 WL 7388075, at *5 (Bankr. N.D. Ill. Dec. 16, 2020). In order for the provision to apply, three conditions must be satisfied: (1) the trust must have been created in "good faith" by (2) someone "other than the judgment debtor," and (3) the assets of the trust must have "proceeded from" someone "other than the judgment debtor." *Id.* As to the latter, which is relevant to the question of whether a trust is self-settled, section 2-1403 does not define the word "proceeded"; however, the plain meaning of the term is "'to come forth from a source.'" *Id. (*citing *Hickory Point Bank & Tr. FSB v. Natural Concepts, Inc.*, No. 3-16-0260, 2017 WL 1392860, at *3 (Ill. App. Ct. Apr. 11, 2017) (quoting *Webster's Third New International Dictionary* 1807 (1976))). Accordingly, trust assets that come from the judgment debtor are "fair game for creditors." *Id.*

The parties here do not contest that the Trust was created in "good faith" by the Debtor's father George Samatas—someone other than the Debtor. (*See* Ex. A at 1.) Rather, only the third element of section 2-1403 (as well as the corresponding second *Perkins* factor) is in dispute. That is, the Trustee asserts—and the evidence establishes—that the Debtor made, or caused to be made, various cash "contributions" to the Trust. First, in 2010, $6 million was transferred from John's Trust to the Debtor's Discretionary Trust for the purchase of the Los Angeles home on Tanager Way; subsequently, in 2012, a partial loan repayment of $2 million was made to John's Trust— not by the Debtor's Discretionary Trust, however, but by his Revocable Trust.[26] Thereafter, in

---

[26] The testimony at trial about the loan from John's Trust to the Debtor's Discretionary Trust and the associated repayment to John's Trust by the Debtor's Revocable Trust was inconsistent, muddied, and difficult to decipher, particularly in connection with the sequence of the payments. Labus testified that the only party obligated to repay the loan was the Debtor's Discretionary Trust but conceded that the payment was made from the Debtor's Revocable Trust. (Tr. 1 at 93:15–94:5.) In contrast, the Debtor testified on direct examination that the $2 million repayment went from his Revocable Trust to his Discretionary Trust and then to John's Trust. (Tr. 2 at 446:7–448:8; *see also* Tr. 3 at 502:24–503:5.) On cross-examination, however, the Debtor grudgingly admitted that the money was wired from his Revocable Trust directly to John's Trust. (Tr. 3 at 503:9–504:22.)

2021, the Debtor made two deposits of $100,000 each into the Trust's bank accounts at BMO—the first when one of the accounts was initially opened in January of that year and the second about nine months thereafter in September.

Not surprisingly, the parties reach conflicting conclusions about the nature and consequences of the transactions. The Trustee argues that, because all of the "contributions" detailed above "proceeded from" or were otherwise made by the Debtor, the Trust is no longer self-settled, and the spendthrift provision is not enforceable. The Defendants disagree. They dispute that the loan transaction constituted a "contribution" to the Debtor's Discretionary Trust. Rather, they argue that the $2 million repayment was made from the Debtor's Revocable Trust only for purposes of "expediency"—to avoid the need to first transfer the money to the Debtor's Discretionary Trust and then to John's Trust—and that the transaction was "booked . . . correct[ly]" by Labus for purposes of accounting. (Dkt. 167 at 13–14.) The Defendants further contend that the Trustee produced no evidence either to contradict the testimony "regarding their treatment" of the repayment to John's Trust or to establish the source of the funds deposited into the Trust's BMO accounts. (*Id.* at 14.)

The Defendants' arguments are without merit. The evidence at trial conclusively established that the repayment of the loan from John's Trust to the Debtor's Discretionary Trust was made directly by the Debtor's Revocable Trust. Beyond that, the Court need not decide whether the loan repayment renders the transfer a "contribution"—thus making the Trust partially self-settled and therefore invalid as a spendthrift trust—because, as discussed extensively below, the Court finds that the Debtor exercised unbridled dominion and control over the Trust, rendering the spendthrift provision unenforceable.[27]

---

[27] The Defendants also claim that the Trustee never argued that the Trust was not self-settled or raised the "contribution issue" prior to the commencement of the evidentiary hearing. (Dkt. 167 at 14.) According to the

Moreover, as set forth above, the Defendants are the ones who bear the burden to establish that the Trust is a valid spendthrift trust. As such, the onus is *not* on the Trustee to produce evidence as to either the treatment of the repayment of the loan or the source of the funds deposited into the BMO accounts.[28]

### 3. Dominion and Control

Finally, the Court turns to the third *Perkins* factor—whether the Debtor had "exclusive and effective dominion and control" over the Trust corpus. The Trustee argues that (1) the Trust document allows the Debtor-beneficiary to exercise unfettered control over the Trust assets, and (2) the Debtor actually exercised complete and unrestrained dominion and control over those assets, thus nullifying the spendthrift protection of the Trust. The Defendants contend, in turn, that the Debtor's actions in connection with the Trust are irrelevant to the issue at bar and that only the Trust agreement itself controls. This argument is also the basis of the Defendants' request for a directed finding on Counts I and II of the complaint.

To determine whether a trust is a valid spendthrift trust, "[t]he degree of control which a beneficiary exercises over the trust corpus is the principal consideration under Illinois law." *Perkins*, 902 F.2d at 1257 n.2; *see also Silldorff*, 96 B.R. at 864 (noting that "[o]f particular interest is the extent of the dominion and control which the beneficiary exercises over the plan's assets"). Although case law makes clear that the beneficiary of a spendthrift trust "must not have any control

---

Defendants, doing so for the first time when cross-examining Labus somehow violated the Rules of Civil Procedure and constituted "trial by ambush." (*Id.*) This argument is not developed, unsupported, and ill-conceived and will not be addressed by the Court.

[28] As to the latter, the Debtor testified that he had "no idea" where the initial $100,000 used to open the BMO account came from. (Tr. 3 at 658:17–21.) Likewise, Labus stated at trial that he did not know the source of either of the $100,000 deposits (Tr. 1 at 127:24–128:7, 143:6–10) and that he needed to look at the accounting records for the Trust in order to discern the sources (*id.* at 128:9–10). As discussed *supra*, however, the Court makes the adverse inference that there were no such records because none were produced in response to the various subpoenas issued by the Trustee. (*See, e.g.*, Tr. 2 at 274:10–278:3.)

over or right to a distribution from the trust," *Lunkes*, 427 B.R. at 429, courts have not adopted a bright-line test for determining when beneficiary control defeats spendthrift protection, *Balay,* 113 B.R. 429 at 437–38 (citing *DiPiazza,* 29 B.R. at 916). However, "something less than 'absolute' control over a spendthrift trust may destroy its spendthrift character." *McCoy*, 274 B.R. at 762 (internal quotation omitted).

In support of their position that the Trust is excluded from the Debtor's bankruptcy estate pursuant to section 541(c)(2), the Defendants primarily argue that, in making the determination as to whether a trust qualifies as a spendthrift trust, Illinois courts consider solely the language of the trust itself. According to the Defendants, the Trustee has failed to identify any provisions in the Trust at issue to establish that the Debtor has exclusive and effective dominion and control over the corpus of the Trust and instead improperly relies on the Defendants' actions in relation to the Trust, as well as the testimony about those actions elicited at trial.

It is true, as the Defendants contend, that in examining the "dominion and control" factor to determine whether a trust constitutes a spendthrift trust, Illinois courts have focused largely on the language of the instruments themselves. *See, e.g., Silldorff*, 96 B.R. at 864 (examining the debtors' interests in basic and supplemental pension plans to determine whether their provisions "demonstrate[d] sufficient access to or control over the corpus" of the plans such that they were "taken outside Illinois' spendthrift trust parameters"); *Dagnall*, 78 B.R. at 534 (finding that a state pension plan did not qualify as a spendthrift trust under Illinois law because the plan itself provided that the debtor could access her contributions to the retirement system by voluntarily terminating her employment with the State of Illinois, thereby exercising control over the trust corpus); *Di Piazza*, 29 B.R. at 922 (concluding that the debtor's pension and profit-sharing plans which allowed him to reach the corpus of either plan fund at any time did not qualify as spendthrift trusts

44

under Illinois law). Indeed, in deciding whether a specific trust can be considered a spendthrift trust, many courts in Illinois have defined the issue as "whether the trust itself was settled in such a way as to preclude invasion by the beneficiary." *See, e.g., Silldorff*, 96 B.R. at 866.

Some Illinois courts, however, have considered both the language of the trust at issue and the conduct of the relevant parties in connection with the trust. In *Johnson v. McCoy (In re McCoy)*, for example, the chapter 7 trustee filed an adversary proceeding against the debtor, both individually and in his capacity as the trustee of a family trust, seeking, among other things, turnover of the trust assets. 275 B.R. 751, 753 (Bankr. N.D. Ill. 2002). The court framed the issue in the case as whether "it was the Settlor's intent expressed in terms of the Trust itself to allow [the] Debtor . . . to take the entire principal at his sole discretion." *Id.* at 762. Although the focus of the analysis was primarily on the language of the trust document, the court also examined the debtor's conduct as sole trustee and primary beneficiary, emphasizing how these roles enabled him to make payments to himself without meaningful restriction. *Id.* at 764–66.

While many Illinois courts have fixed their attention on the language of the trusts themselves in determining whether the instruments constitute valid spendthrift trusts, no court in Illinois—either federal or state—has addressed the issue currently before this Court. Namely, the precise question raised by the Defendants, in pleadings, at trial, and in their written and oral requests for a directed finding, is whether courts must limit their analysis of the "dominion and control" factor by examining solely the language of the trust document or if they can also consider the actual control exercised by the debtor-beneficiary—looking beyond the four corners of the trust. Neither the United States Supreme Court nor the Seventh Circuit has squarely dealt with this issue.

45

In conducting its own independent research on the question in this matter, as well as reviewing the case law cited by the parties, the Court noted that *Richardson v. McCullough (In re McCullough)*, a case from the Bankruptcy Court for the District of Rhode Island, addresses precisely the same issue as the one here.[29] 259 B.R. 509 (Bankr. D.R.I. 2001). In *McCullough*, the trustee filed a complaint seeking to revoke the debtor's chapter 7 discharge and compel turnover of the debtor's interest in the proceeds of his wife's trust as property of the bankruptcy estate. *Id.* at 512. The debtor was the sole beneficiary under the trust, and his father was named as trustee. *Id.* at 513–14. In his post-trial brief, the trustee argued that a trust addendum executed by the debtor and his wife, as well as the actions of the debtor and the trustee, clearly demonstrated that the debtor had exclusive control over the disbursements of the proceeds of a certain life insurance policy. *Id.* at 513. According to the trustee, the debtor's "absolute dominion and control over the [trust] funds invalidate[d] the spendthrift provision of the [t]trust, rendering the [d]ebtor's interest" therein property of his bankruptcy estate under section 541(c)(2). *Id.* The defendants, in turn, urged the court to "end its inquiry" with the spendthrift provision in the original trust, without considering either the addendum or the actions of the debtor or trustee. *Id.* at 518

The *McCullough* court found that the original trust could not be examined "in a vacuum" but had to be scrutinized "together with the [a]ddendum *and the conduct of the [d]ebtor,* which disclose[d] blatant and unfettered dominion and control over the [t]rust assets." *Id.* (emphasis in original). After briefly examining the language of the addendum, which, the court found, gave the debtor unrestricted power to make disbursements at his sole discretion, the court continued its analysis by considering the conduct of the debtor-beneficiary. According to the court, the evidence

---

[29] Spendthrift trust laws in Rhode Island and Illinois are similar in principle with respect to protection for third-party beneficiaries but differ in their approach to self-settled trusts. Both states recognize spendthrift provisions that protect a beneficiary's interest from voluntary or involuntary transfer, but Rhode Island has more protective laws for self-settled assets. *See* RI Gen. Laws § 18-9.1-1; 760 ILCS 3/502.

at trial conclusively established, among other things, that almost all trust fund disbursements were made, directly and unsupervised, by the debtor; that the trustee's role was limited to signing the trust account checks that the debtor put in front of him, with no questions asked; that the trustee left signed, blank checks for the debtor's "carte blanche use"; and that the debtor opened a stock trading account by using the trustee's signature stamp, named himself as co-trustee on the account, and then traded stock in the account, all without the knowledge or permission of the trustee. *Id.* at 518–19.

The court concluded that, based on all of the debtor's actions, the passive role played by the trustee, the language of the addendum, and the intentions of the parties, the debtor exercised "sufficient control and dominion" over the trust funds to nullify the trust's spendthrift protection. *Id.* at 519. In making its decision, the court narrowly construed section 541(c)(2), based on the "important policy" of the Bankruptcy Code "to enlarge the bankruptcy estate to the extent possible under the Code in an effort to provide creditors with the distribution to which they are entitled." *Id.* at 518 (internal quotations omitted).[30]

---

[30] The Defendants contend that the Trustee's discovery of *McCullough* was the result of his "scour[ing] the country" to find authority to "support[] his position" and suggest that neither the Trustee nor the Court may properly look at "foreign law" because there are "many Illinois cases cited by the parties, all of which support [the] Defendants' position." (Dkt. 167 at 8.) They also try to distinguish the facts and law in *McCullough*, arguing that the case is, therefore, "of no consequence." (*Id.* at 8–110.) The Defendants are wrong on all counts. First, none of the Illinois cases cited by the parties has found—expressly or implicitly—that courts may not evaluate the conduct of trust beneficiaries, trustees, investment advisors, and other relevant parties in deciding whether a debtor-beneficiary has exerted such dominion and control over the corpus of a trust as to invalidate the spendthrift protections provided under the trust. Second, *McCullough* is the only case that the Court was able to find that precisely discusses the issue at bar. The fact that the matter is one of first impression in Illinois and this circuit does not preclude the Court from considering the arguments presented by both parties, scrutinizing any law that may be applicable, and reviewing the holdings articulated in cases in other circuits. *See In re Sterling Mining Co.*, 415 B.R. 762, 768 (Bankr. D. Idaho 2009) (noting that the fact that state law might be unsettled does not require the court to "cease its duties to adjudicate disputes"), *aff'd*, 2010 WL 1816176 (D. Idaho May 2, 2000). Finally, the Defendants' attempts to distinguish *McCullough* fail. While not identical to those in the matter at bar, many material facts in *McCullough* are actually quite similar to the facts here, making *McCullough*'s analysis germane to this Court's review. The Defendants' efforts to distinguish the law in *McCullough*—primarily that the law is inapplicable because "Illinois has its own case law"—are simply unavailing.

The *McCullough* court's conclusion is bolstered by an examination of the language used by the Seventh Circuit in setting out the factors in *Perkins*. Specifically, the first factor—"whether *the trust* restricts the beneficiary's ability to alienate . . . the trust corpus"—directs courts to look to "the trust," to examine the contents and verbiage used in the document itself. *See Perkins*, 902 F.2d at 1257 n.2 (emphasis added). The third factor, however—"whether the beneficiary has exclusive and effective dominion and control over the trust corpus"—suggests that courts should look beyond the formal terms of the trust document to determine if the beneficiary has the real-world capacity to use the trust assets as his own. *See id.* Such an interpretation is derived in large part by the Seventh Circuit's use of the modifier "effective" in describing the required "dominion and control."

The word "effective" is not defined in the Bankruptcy Code, in the context of control or otherwise. When the Code does not define words or phrases, the Court must "look to their ordinary meanings." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 715 (2018). The word "effective" means, in pertinent part, "[e]xisting in fact; actual." *Effective, American Heritage College Dictionary* (3d ed. 2000); *see also Effective, Webster's New World College Dictionary* (4th ed. 2008) (defining "effective," in relevant part, as "actual, not merely potential or theoretical"); *Effective Control, Black's Law Dictionary* (10th ed. 2014) (defining "effective control" as "[t]he physical retention of possession of an item or its maintenance in a secure place"). Based on these definitions, "effective dominion and control" refers to a beneficiary's actual, practical ability to access, manage, direct the distribution of, or terminate the trust corpus. Indeed, courts must examine the practical reality of the beneficiary's power; if a beneficiary, even as a co-

48

trustee, can actually compel distributions or influence decisions, he has "effective dominion and control."[31]

After a comprehensive and thorough review of the case law on the issue at bar and an examination of the language of the factors in the Seventh Circuit's *Perkins* decision, the Court adopts the reasoning in *McCullough* and holds that both the language of the Trust document in this matter and the actual conduct of the Debtor and other relevant parties can and should be considered in deciding whether the Debtor exercised such dominion and control over the Trust corpus that the Trust does not qualify as a spendthrift trust under Illinois law. Accordingly, the Court now turns to an examination of both the Trust document itself and the Debtor's and Labus's conduct to decide whether the Trust qualifies as a spendthrift trust.

### (a) The Trust Itself

In construing a trust, the primary objective is "to determine the settlor's intent from the trust as a whole." *Lunkes*, 427 B.R. at 430. That intent "should be determined by perusing the words used in the [trust] for their plain meaning before applying rules of construction. *McCoy*, 274 B.R. at 764.

In this matter, the language of the Trust document itself undeniably establishes the settlor's intent to give the Debtor multiple roles in connection with the operation and administration of the Trust. Specifically, the Debtor is the beneficiary under the Trust, as well as a co-trustee and the investment advisor. (Ex. A, Art. IV, Art. VII § 2; *see also id.*, Art. XIV § 1.) Although the Trust empowers its trustees with the "sole discretion . . . to distribute all or any part of the net income

---

[31] In analyzing the language of the third *Perkins* factor in their post-trial brief, the Defendants' focus, instead, is on the word "has." (Dkt. 167 ¶ 5.) That is, according to the Defendants, "the third factor asks 'whether the beneficiary <u>has</u> effective dominion and control,' not whether the beneficiary has acted in a manner that is deemed to constitute dominion and control over the corpus." (*Id.*) Without support, further development, or explanation, the Court finds this argument unpersuasive.

and/or principal" of the Trust to the beneficiary, "at any time and from time to time" (*id.*, Art. IV § 1), the Debtor is restricted in that regard. That is, because the Debtor is both a co-trustee and a beneficiary, he is not permitted to "have any voice, determination or vote relating to any discretionary distribution of the income or principal" of the Trust. (*Id.*, Art. XIV § 3; Tr. 1 at 55:3–23; *see also id.*, Art. XV (defining "restricted trustee".) Rather, "all such decisions" must be made by Labus, the non-restricted co-trustee. (*See id.*)

Other than that limitation, the Trust provides both the Debtor and Labus, as co-trustees, with a dizzying array of powers, rights, and duties "for the sole benefit of the beneficiary."[32] (*Id.*, Art. XI § 1(a)–(dd).) Among them, the Trust gives the trustees the authority to hold, manage, insure, improve, repair, control, and/or sell all Trust property; to lease or license the use of any personal property of the Trust; to borrow money from any source, extend or renew any existing indebtedness, and mortgage or pledge any Trust property; to guarantee payment of any loan from a third party to a beneficiary; and to settle, compromise, or abandon claims or demands in favor of or against the Trust. (*Id.* §§ 1(a)–(f).) The Trust further provides that the trustees may abandon any property they deem to be worthless or not of sufficient value to warrant keeping or protecting; to invest and reinvest the Trust estate wholly or partially; to purchase or otherwise acquire any business or business interests; and to determine whether receipts shall constitute and expenses are properly chargeable to principal or income. (*Id.* §§ 1(h), (i), (k), (l).) The trustees are also empowered by the Trust to cause any property to be issued, held, or registered in any trustee's individual name, without indication of any fiduciary capacity; to open and maintain savings and

---

[32] The only other limitations imposed on the restricted trustee under the Trust are: (1) voting or otherwise participating "in any decision as to the advisability or the manner in which" the power to amend the trust to permit that trust to hold stock in an S corporation "shall be exercised"; and (2) having "any voice, vote or otherwise participat[ing] in any decision to grant or to eliminate a previous grant of a testamentary general power of appointment to any beneficiary." (Ex. A, Art. XI § 1(z), (bb).) Neither of these restrictions is relevant to the matter at bar.

checking accounts and to deposit in those accounts all or any part of the Trust's funds; and to lend the principal of the Trust to the beneficiary or make loans to other people, partnerships, corporations, trusts, or estates as the trustees deem advisable. (*Id.* §§ 1(o), (s), (t).) In order to exercise any of their powers under the Trust or carry into effect any provisions in the instrument, the trustees may make any payment, receive any money, take any action, and make, execute, deliver, and receive any contract, deed, instrument, or document. (*Id.* § 1(x).) As an additional catchall, the Trust provides that the trustees are authorized "to do all other acts which in the judgment of the [trustees] are necessary or desirable for the proper administration of the [T]rust estate." (*Id.)*

In addition to all of the power conferred on him by the Trust as a co-trustee, albeit a restricted one, the Debtor's role as investment advisor of the Trust also gives him absolute discretion over how assets of the Trust are invested, including the power to direct the trustees to lend Trust assets, as an investment, to the Debtor himself or to his Revocable Trust. (*Id.*, Art. VII § 1.) Tortorich, the Defendants' expert witness, elaborated at trial on the role of the investment advisor, explaining that, unlike a beneficiary-trustee who is restricted from making discretionary distributions to himself, the investment advisor has "the freedom to invest without having to" consult with his co-trustee. (Tr. 3 at 671:1–22; *see also id.* at 672:21–673:16.) Tortorich also explained—and the Trust provides—that the investment advisor is the one who makes the investment decisions but that those decisions must be executed by the trustee, who has no discretion in that regard. (*Id.* at 676:19–677:7.) Although the Trust states that the Debtor, as investment advisor, is "subject to all of the privileges, duties and obligations of a [t]rustee" under the Trust (Ex. A, Art. VII § 1), Tortorich testified that the investment advisor "has no authority to [actually] do anything"; rather, he "direct[s] the trustees to" act (Tr. 3 at 733:21–24).

51

Tortorich explained that it is "very common" for a trust to include bifurcation provisions under which an investment advisor controls the investments of a trust and the non-restricted trustee handles the distributions. (*See id.* at 670:14–676:18.) In this case, however, such an arrangement is problematic, because the Trust gives the Debtor far more control than that allowable under Illinois spendthrift trusts. Specifically, by putting the beneficiary in the role of investment advisor with binding authority over the co-trustee, the Trust, by its terms, eliminates any meaningful restriction on alienation of the Trust's corpus.

As to the latter, the Debtor testified—and the Defendants argue—that, pursuant to its terms, the Trust authorizes the Debtor, as investment advisor, to instruct the co-trustee, either Labus or the Debtor himself, to make loans to the Debtor as beneficiary and then to unilaterally forgive those loans. Indeed, the Trust provides that Labus, as co-trustee, may not question or otherwise challenge the directives of the Debtor, as investment advisor, but must comply with them, whether he agrees or not.

At trial, the Debtor readily testified that, pursuant to the Trust, he essentially has free rein to do whatever he wants with respect to the administration of the Trust and the use of its assets. That is, according to the Debtor, he does not need Labus's permission to approve any transaction to or with himself:

> Q:  As the co-trustee[,] . . . you had no authority under the Trust to approve
>      a distribution, loan, transaction to yourself, correct?
> A:   I had --
> Q:  You were a restricted trustee?
> A:  Yes.
> Q:  And the restriction was that you couldn't do it, but Mr. Labus had to do
>      it, right?
> A:  Do what?
> Q:  Approve any transactions involving yourself.
> A:  No. He did not have to approve the investment advisor thing. He had to
>      know about it; he didn't have to approve it.

52

(Tr. 3 at 518:4–19.) Similarly, the Debtor testified that the terms of the Trust authorized him, in his sole discretion, to forgive a loan to himself:

> Q: And you authorized your attorney to file the Waiver of Claim on behalf of the Discretionary Trust, correct?
> A:  Yes.
> Q: Under what authority under the Trust document --
> A: Yes.
> Q: -- did you make that determination?
> A: Under my capacity as investment advisor. The issue of waiver of claim was my right as an investment advisor, whether or not I wanted to collect a debt. That's very clear cut, Mr. Blonder. It's my right as an investment advisor to decide whether I want to pursue a debt or not, not Mr. Labus's decision.

(*Id.* at 569:19–570:9.) In sum, the Debtor testified that, as the investment advisor of the Trust, he could do almost everything that an unrestricted trustee could do, other than make distributions to himself as beneficiary. (*Id.* 639:13–640:6 (stating that he "could act almost . . . as if [he were] an unrestricted trustee").)

Based solely on the terms of the Trust itself—as well as the Defendants' own interpretation of the Debtor's authority under the Trust—the Court finds that the Debtor, in his roles as co-trustee and investment advisor, was able to reach the Trust assets at any time and had the power to make transfers from the Trust at will. Thus, the Trust gives the Debtor—the only beneficiary thereunder—unfettered authority to make disbursements in his sole discretion. This level of control, which fails to sufficiently restrain the Debtor-beneficiary's access to the Trust corpus— invalidates the spendthrift provision.

### (b) The Debtor's and Labus's Actual Conduct

In addition to the language of the Trust document, an examination of the Debtor's actual conduct—as well as Labus's actions or inaction—overwhelmingly demonstrates that the Debtor had "exclusive and effective dominion and control" over the Trust corpus such that the Trust

cannot constitute a spendthrift trust under Illinois law. In fact, seldom has the Court been presented with a matter in which a required element has been so compellingly established. In short, both the parties' stipulated facts and the documentary and testimonial evidence at trial unequivocally demonstrate that the Debtor treated the Trust like his own personal piggy bank.

Both the Debtor and Labus attempted to establish, throughout the trial, that the Debtor acted in compliance with the terms of the Trust by classifying the various transactions that he made as either "investments" as investment advisor or as "loans" as co-trustee, rather than as "distributions" which he was not allowed to make as a restricted trustee under the Trust. The evidence showed, however, that, in making the transactions, the Debtor overstepped his authority at every turn.

With respect to investments, when asked by Trustee's counsel to list every action that he had taken as the investment advisor of the Trust since July 2018, the Debtor testified only as to three lawsuits that he had initiated or was involved in, noting that he "had the upside potential" of big profits if he were to prevail. (*Id.* at 556:18–560:23; *see also* Tr. 2 at 472:21–473:2.) On redirect, the Debtor testified that he also acted as investment advisor in causing the filing of the Waiver of Claim against the Debtor personally on behalf of the Trust, opening the BMO bank accounts, and selling some of the Trust's Personal Property on consignment. (Tr. 3 at 650:19–652:10.) The Court examines each of these assertions in turn.

First, the Waiver of Claim was not an "investment"; rather, because it forgave a loan to the Debtor, the waiver constituted a distribution, something that the Debtor was not authorized to make as either an investment advisor or a restricted trustee under the Trust. (Tr. 2 at 318:9–14, 327:200– 328:3 (Fitzpatrick explaining that, generally, when a loan is forgiven, the transaction is considered a distribution and that the waiver of claim "would be characterized under custom and practice as

54

in effect, if it's made to a beneficiary, as a distribution").) By making the decision to waive any claims that the Trust had against the bankruptcy estate, thereby forgiving the balance of any loans to himself, the Debtor effectively made a distribution to himself as beneficiary.

As for the establishment and use of the Trust's BMO bank accounts, the Debtor had complete control over those accounts and treated them as if they were his own. The Debtor was the only signatory on the Trust's BMO accounts; only his name—in his individual capacity—was printed at the top of the checks; and he had the ability to transfer funds out of the accounts without obtaining Labus's signature. (Dkt. 138 ¶¶ 39–42.) Moreover, the Debtor used a debit card linked to one of those bank accounts, wrote checks from the account, and withdrew funds to pay for his personal living expenses, which totaled up to $10,000 per month. (*Id*. ¶¶ 43, 45.) Labus testified that the Debtor did not have to consult him before using the debit card to access the funds but, rather, that he could use the card freely to pay for his living expenses. (Tr. 1 at 134:20–135:13.) Despite that testimony, the Defendants failed to produce any evidence to demonstrate that the Debtor, as the restricted co-trustee, was authorized to make any of these transactions.[33]

The Debtor testified at trial that he paid for his living expenses from the BMO account in his capacity as investment advisor. (Tr. 3 at 548:4–11 (explaining that those purchases "kept [him] alive," allowing him to "buy food . . . so [he] could pursue . . . litigation[]"). This claim is ludicrous.

---

[33] Fitzpatrick and Tortorich, the expert witnesses for the parties, both testified that the establishment and operation of the Trust's BMO accounts did not comply with industry standards. According to Fitzpatrick, the way in which the accounts were created was "inconsistent with what a reasonable fiduciary would do." (Tr. 2 at 302:10–12.) The Debtor's "name alone, as opposed to a fiduciary designation," would give the Debtor "control over the distributions out of that account, at least as far as any third party was concerned." (*Id.* at 302:10–19.) Similarly, Tortorich said that, in his practice, he "would never give the beneficiary" of a trust a debit or credit card to draw down funds from a trust bank account and would not ever advise a trustee to do that either. (Tr. 3 at 699:8–700:3, 724:11–24.) Chuck Harris, the estate planner for the Samatas family, also testified that he would "[a]bsolutely not" sanction the practice of giving a beneficiary a debit card to use in conjunction with a trust bank account and that he did not advise either the Debtor or Labus to provide the Debtor with such a card for any Trust account. (Tr. 4 at 775:20–776:5.)

The debit-card transactions were *not* "investments," made by the Debtor as investment advisor, because they did not require the Debtor to make decisions to sell, vote, or take any other action with respect to the investment of the Trust assets.[34] In other testimony, the Debtor changed his story, suggesting that he did not breach the provisions of the Trust by unilaterally withdrawing money from the BMO account for living expenses because those funds constituted a loan to him.[35] (Tr. 2 at 462:23–463:10.)

Regarding the Personal Property that he transferred to the Trust, the Debtor entered into agreements with third parties to sell the various items, and then retained the proceeds from those sales in his personal bank accounts or those of his Revocable Trust. (Dkt. 138 ¶¶ 19–28; Exs. M, EE.) All the while, the Debtor had actual, physical possession of the property but failed to maintain, produce, or otherwise provide records of the assets, at the time they were transferred or otherwise. (Tr. 1 at 194:9–11, 196:1–3.)

Although he serves as the non-restricted trustee and is thus charged with, among other things, safeguarding the assets of the Trust, Labus testified that he never took an inventory of the Trust's personal property and, in fact, did not even know which assets were owned by the Trust. (*Id.* at 159:18–20, 161:19–162:6, 194:5–199:15.) Thus, he said, it would have been impossible for him to ascertain which items were sold or otherwise disposed of. (*Id.* at 195:9–25.) Because he did not take or maintain an inventory of the Trust's personal property (or any other assets for that

---

[34] In subsequent testimony, the Debtor stated that the transactions to pay his living expenses were not, in fact, made by him as investment advisor. (Tr. 3 at 550:8–21.)

[35] Although Tortorich testified that he had "seen" transfers of funds to pay for a beneficiary's living expenses classified as either loans or distributions, he said that they are "[m]ore often" distributions and conceded that the Debtor's transfers out of the BMO checking account were "distributions" because they were used for "everyday consumption." (*Id.* at 727:8–25.)

matter), Labus testified that he knew or learned about the sale of any of those items only if the

Debtor informed him:

> Q: [Y]ou weren't keeping an inventory on an ongoing basis of the paperweights and other things that the Discretionary Trust has, so [how would] you know if [the Debtor] actually sold anything if he didn't tell you?
> A: Well I have to tell you this. I have to be able to trust my beneficiary and my co-trustee. If I can't do that, I mean, I don't know where to go other than that.

(*Id.* at 178:15–23.)

Labus conceded that the Debtor was able to sell Trust assets without his consent. (*Id.* at 179:14–20.) Although he testified that he knew about the sales of various pieces of artwork and that he recorded the payment of the proceeds of those sales to the Debtor individually as a loan, the Defendants produced no evidence at trial to establish that Labus had knowledge of the sales, approved them, was aware that the Debtor retained the sales proceeds, or approved any loan to the Debtor of those proceeds. In fact, when asked whether Labus's actions were consistent with both the terms of the Trust and custom and practice in the industry, Fitzpatrick said that there was "absolutely nothing in the record that indicates [Labus's] fulfillment of his obligations" or that he "is following the terms of the Trust." (Tr. 2 at 339:19–22.) Rather, Fitzpatrick said, "it appears . . . that [Labus] did not effectively act as the non-restricted trustee" and that, indeed, he "seems to have abdicated the role of trustee." (*Id.* at 339:23–25.)

Based on all of the documentary evidence and testimony at trial, the Debtor clearly had exclusive dominion over the Trust's Personal Property, the power to sell that property, and the ability to retain the proceeds of any sales, all without the consent or knowledge of Labus, the non-restricted co-trustee.

None of the transactions discussed above, nor most of the others conducted by the Debtor in connection with the Trust, can be accurately classified as "investments," because the Debtor failed to inform his co-trustee of his decisions *in writing*, a requirement expressly specified in the terms of the Trust. (Dkt. 138 ¶ 13.) Indeed, there was no evidence presented at trial that Labus took action with respect to the purported investments "upon written instructions" from the Debtor, as investment advisor, or that Labus was even aware of the transactions. The Debtor does not dispute that written instructions were required before a trustee could act with respect to the investment of the Trust assets. (Tr. 3 at 512:5–15.)  He stated, however, that written directives to Labus were not necessary because he could simply instruct *himself* to perform as the other trustee. (*Id.* at 512:5–514:14.) Such an interpretation of the investment advisor provision in Article VII of the Trust essentially nullifies the restriction placed on the Debtor as a beneficiary-trustee, allowing him to exercise unfettered control over the Trust corpus.[36]

While the Debtor and Labus claimed, unconvincingly, that many of the transactions at issue were "investments" made as a result of the Debtor's decisions as investment advisor, at the same time they characterized some of those transactions and others as "loans," which the Debtor made in his capacity as co-trustee of the Trust. (*See, e.g.,* Tr. 2 at 261:1–263:1 (identifying the Parker-Mills Guaranty as a loan that the Debtor "would have paid back"); 441:13–15 (describing as a loan the $10 million line of credit to "purchase personal property over a period of time" which would be "repaid back to the Trust"); 443:23–444:10 (explaining that the Debtor's "Discretionary Trust borrowed $6 million from [his] brother's discretionary trust" to purchase the Tanager home in California and that such funds would be "repaid"). In fact, both the Debtor and Labus testified that

---

[36] In any event, the Debtor's testimony that he gave himself written notice was unconvincing, highly implausible, and just plain absurd. (Tr. 3 at 514:9–16 (responding, when asked if he gave himself "written notice," "Yeah. And I don't have those records anymore if I did. What's the point? What is the point?").)

58

their attorneys had recommended—and the two of them had agreed—that any funds taken from the Trust would be treated as loans to be paid back, unless expressly designated otherwise. (Tr. 1 at 66:4–6; Tr. 2 at 256:12–16, 485:4–486:6; *see also id.* 319:7–11.)

Fitzpatrick testified that that sort of an agreement is "completely contrary to industry practice." (Tr. 2 at 337:4–8.) In fact, he said, pursuant to what is customary in the industry, "any transfer out of a trust would be a distribution unless otherwise characterized." (*Id.* at 337:9–11.) Further, Fitzpatrick explained that "industry custom and practice" require "that the nature of [a] transfer as something other than a distribution [must] be clearly memorialized." (*Id.* at 337:12–15.) In that regard, he said, if a transfer is a loan, the documentation must "indicate the particulars of the loan: term, interest, security." (*Id.* at 337:16–19.)

Tortorich's testimony about the designation of transactions as loans was consistent with Fitzpatrick's. According to Tortorich, a transaction is mischaracterized as a loan if there is no term designated, no interest required, and no documentation memorializing the transaction. He testified that characterizing a transaction as a loan would be "a problem" without those essential elements. (Tr. 3 at 722:15–20.) He also agreed that a transaction lacking those components would "probably be a distribution." (*Id.* at 723:16–20, 733:9–13.)

As to the interest element, Harris testified that he advised both the Debtor and Labus "about the importance of paying at least interest to make the loans look appropriate." (Tr. 4 at 784:5–12.) Correspondingly, Labus claimed that interest was charged on all loans made to and by the Debtor and his Trust. (Tr. 1 at 72:22–73:1.) No evidence was produced, however, to establish that any interest had actually been charged or paid on any of those "loans."

In fact, the Defendants failed to produce any evidence to demonstrate that the transfers that Labus and the Debtor characterized as loans were documented or that they required repayment

either within a particular period of time or with interest.[37] Because those transactions, as well as the others discussed above, do not constitute either loans or investments pursuant to the terms of the Trust, but, rather, are more accurately characterized as distributions, the Debtor violated the Trust by unilaterally executing those transfers without the authority to make them as investment advisor or restricted trustee. (*See* Tr. 3 at 735:9–736:18.)

### 4. The Remedy for Breach

With one last gasp, the Defendants argue that even if any of their actions were improper, the remedy for a breach by a trustee under Illinois law is to remove the trustee, not to invalidate the trust. In support of their position, the Defendants rely on *Altschuler v. Chi. City Bank & Tr. Co.*, 43 N.E.2d 673 (Ill. 1942), *rev'd in part on other grounds by Yedor v. Chi. City Bank & Tr. Co.*, 44 N.E.2d 604 (Ill. 1942). In that case, the defendant bank was the trustee of a trust which was created as part of a financing and property arrangement, a common land-trust type of structure that was used in Chicago at the relevant time. *Id.* at 674. The plaintiff challenged the validity and administration of the trust, alleging misconduct by the trustee bank in carrying out its duties. *Id.* at 674–76. The court found that a trustee's improper conduct does not terminate or invalidate an otherwise valid trust, but, rather, that the appropriate remedy for breach of trust under Illinois law is the removal of the trustee and the appointment of a new one. *Id.* at 676 (citing *Brower v. Callender*, 1882 WL 10483 (Ill. Nov. 20, 1882) (explaining that "if the trust were valid, the remedy for a breach of trust, or a failure to perform his duty by the trustee, would be simply the removal of the old trustee and the appointing of a new one[]—not the setting aside of the deed of trust").)

---

[37] The only exception was the $10 million Revolving Loan for which there was documentation in the form of a Demand Note, which does call for interest. However, the Defendants testified that they did not comply with the provisions of the Demand Note, and no evidence was provided to demonstrate that interest was ever charged or paid.

As discussed *supra*, the Trust itself allows the Debtor-beneficiary to assume multiple roles which empower him—and ultimately give him unchecked authority—to take action at will for his own benefit in ways that are inconsistent with the purpose of a spendthrift provision. As such, the Trust is *not* a valid trust, and the *Altschuler* court's holding with respect to the remedy for breach of trust is not applicable in this matter.[38]

Based on the language of the Trust itself, the Defendants' own interpretations of the terms thereof, the actions of the Debtor, and the uninvolved and hands-off role played by Labus, the Court finds that the Debtor executed sufficient dominion and control over the Trust to invalidate the spendthrift trust provision. Accordingly, the Court holds that the Trust is part of the Debtor's bankruptcy estate and that his creditors may reach the Trust assets. The Defendants' request for a directed finding on Count I is denied.

### Count II: Alter Ego or Reverse Veil Piercing

In Count II of the adversary complaint, the Trustee argues, in the alternative, that the Trust is merely the alter ego of the Debtor. According to the Trustee, not only does the Debtor have unlimited and unrestricted access to the Trust assets, but he has also disregarded the formal requirements in operating the Trust and administering, using, and managing the Trust assets. As such, the Trustee asks the Court to find that the Trust is an alter ego of the Debtor. Although the Trustee labels his claim under Count II as "alter ego," reverse veil piercing, discussed *infra*, also

---

[38] The Defendants also argue that "logic and common sense tell us that in a dynasty trust, misconduct by a current beneficiary should not destroy a non-self-settled trust which would provide for future beneficiaries." (Dkt. 167 ¶ 36.) The Trust itself, however, makes clear that the settlor's paramount intent in establishing the Trust was to benefit the Debtor, even at the expense of any "future beneficiaries." Specifically, Article X of the Trust provides, in pertinent part, that "it is the Grantor's desire that the [t]rustee exercise the discretionary powers herein conferred primarily to benefit the beneficiary of [the Trust], rather than the remaindermen of such . . . [T]rust, even to the extent of terminating [the Trust] by distributing the entire [T]rust estate to the beneficiary and thereby eliminating the contingent interest of the remaindermen." (Ex. A, Art. X.) Thus, the Defendants' argument is without merit.

accurately describes the relief that the Trustee is pursuing.[39]

Under Illinois law, "[a] corporation is a legal entity separate and distinct from its shareholders, directors, and officers." *In re Rehab. of Centaur Ins. Co.,* 632 N.E.2d 1015, 1017 (Ill. 1994). This "separate and distinct" entity will be disregarded, and the corporate veil pierced, however, if the "observance of the fiction of separate identities would sanction a fraud or promote injustice." *Id.* at 1017–18. Courts have found that piercing the corporate veil is justified if the corporation is merely "'the alter ego or business conduit of the governing or dominant personality.'" *Reid v. Wolf (In re Wolf)*, 644 B.R. 725, 748 (N.D. Ill. 2022) (quoting *Semande v. Estes*, 871 N.E.2d 268, 271 (Ill. App. Ct. 2007)), *aff'd,* 2023 WL 6564882 (7th Cir. Oct. 10, 2023).

The party seeking to set aside the corporate identity of one entity as the alter ego of another bears "the burden of establishing that the corporation was so controlled and manipulated that it had become a mere instrumentality of another, and furthermore, that misuse of the corporate form would sanction a fraud or promote injustice." *Chi. Florsheim Shoe Store Co. v. Cluett, Peabody & Co.*, 826 F.2d 725, 728 (7th Cir. 1987); *see In re Estate of Wallen*, 633 N.E.2d 1350, 1357 (Ill. App. Ct. 1994) (noting that "[a] party seeking to pierce the corporate veil has the burden of making a substantial showing that one corporation is really a dummy or sham for another" (internal quotation omitted)).

To pierce the corporate veil, two elements must be established. First, "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and second, "circumstances must be such that adherence to the fiction of a

---

[39] Courts use the terms "alter ego" and "reverse veil piercing" interchangeably. *See, e.g., Goldstein v. Graft (In re Graft)*, Case No. 22 B 02921, Adv. No. 24 A 00069, 2025 WL 45085, at *4 (Bankr. N.D. Ill. Jan. 7, 2025) (referring to "reverse piercing of the corporate veil (or, alternatively, alter ego)"); *Martino v. Shakir (In re Shakir)*, 643 B.R. 203, 211 (Bankr. N.D. Ill. 2022) (noting that the Illinois Supreme Court has held that "a corporation may not pierce its *own* veil by asserting an alter ego action against its shareholders").

separate corporate existence would sanction a fraud or promote injustice." *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751–52 (7th Cir. 2012) (internal quotations omitted). Illinois courts consider the following factors to determine whether there is a unity of interest: "(1) inadequate capitalization; (2) failure to observe corporate formalities; (3) insolvency of the debtor; (4) nonfunctioning of the other officers or directors; (5) absence of corporate records; (6) commingling of funds; (7) diversion of assets from the corporation by or to a shareholder; (8) failure to maintain arm's length relationships among entities; and (9) whether the alleged alter ego is a mere facade for the alleged principal." *Goldstein v. Graft (In re Graft)*, Case No. 22 B 02921, Adv. No. 24 A 00069, 2025 WL 45085, at *3 (Bankr. N.D. Ill. Jan. 7, 2025); *see also Martino v. Shakir (In re Shakir)*, 643 B.R. 203, 213 (Bankr. N.D. Ill. 2022). "[N]o single factor is determinative in deciding whether to disregard a corporate entity." *Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc.*, 196 F. Supp. 2d 731, 738 (N.D. Ill. 2002) "Once the first element of the test has been established, *either* the sanctioning of a fraud (intentional wrongdoing) or the promotion of injustice[] will satisfy the second." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 570 (7th Cir. 1985) (explaining that intent to defraud creditors is not required to demonstrate that continued observance of the corporation as a separate and distinct entity would promote injustice). The nature of the veil-piercing analysis is "fact intensive" and must be conducted on a case-by-case basis. *Gleghorn v. Mika Logistics Inc.*, No. 21 C 1357, 2022 WL 1228195, at *4 (N.D. Ill. Apr. 26, 2022).

There are two types of veil piercing: conventional and reverse. *Wolf*, 644 B.R. at 748. Conventional veil piercing "imposes liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Id.* (internal quotation omitted). In contrast, reverse piercing allows a shareholder's creditors to reach the corporation's

assets. *Scholes v. Lehmann*, 56 F.3d 750, 758 (7th Cir. 1995); *see also Wolf*, 644 B.R. at 748

(explaining that reverse piercing holds "the corporation liable for the actions of its shareholder or

someone who controls the entity" (internal quotation omitted)).

Reverse veil piercing itself is characterized in one of two ways—as inside piercing or

outside piercing. *Wolf*, 644 B.R. at 749. Inside reverse piercing occurs when an insider of a

corporation attempts to pierce the veil of the entity of which he is a part. *Id.* "Inside reverse veil

piercing is not recognized in Illinois." *Id.* (citing *Centaur,* 632 N.E.2d at 1018, and *Semande*, 871

N.E.2d at 271). Outside reverse piercing, on the other hand, allows a "third-party creditor to pierce

the corporate veil to satisfy the debts of an individual shareholder out of the corporation's assets."

*Id.* (internal quotation omitted).

The Illinois Supreme Court has not explicitly approved the use of outside reverse veil

piercing. "In the absence of [such] precedent, [federal courts] must use [their] best judgment to

determine how that court would construe its own law[] and may consider the decisions of the

Illinois appellate courts." *Wolf*, 644 B.R. at 751 (quoting *Neth. Ins. Co. v. Phusion Projects, Inc.*,

737 F.3d 1174, 1177 (7th Cir. 2013)). Doing just that, other courts in Illinois addressing the issue

have recognized reverse veil piercing as an equitable remedy. *See, e.g., id.* at 749–52 (finding,

after extensive and thorough analysis, that "Illinois would recognize outside reverse veil piercing

generally"); *Graft*, 2025 WL 45085, at *4 (explaining that "it seems unlikely that Illinois law

would always permit hiding assets in a trust to keep them from creditors when a now-debtor (as

alleged here) directs substantially all activities of that trust [and] treats the trust as his own personal

piggybank"); *Shakir*, 643 B.R. at 212 (concluding that "Illinois law d[id] not bar the Trustee from

reverse piercing the veil of an Illinois company"); *see also Boatmen's Nat'l Bank of St. Louis v.*

*Smith*, 706 F. Supp. 30, 31–32 (N.D. Ill. 1989) (finding "nothing problematic about reversing the

64

traditional piercing procedure" while acknowledging that "no Illinois court ha[d] squarely addressed this issue"); *Crum v. Krol*, 425 N.E.2d 1081, 1088–89 (Ill. App. Ct. 1981) (noting that, "[w]hile . . . the concept of a 'reverse pierce' has not been at issue in the overwhelming number of corporate veil cases, . . . the same equitable considerations of preventing injustice should apply when it is a third party, rather than a shareholder or officer, who attempts to use the corporate entity as a shield").

In addition, the Seventh Circuit acknowledged decades ago the applicability of outside reverse veil piercing. *See Scholes*, 56 F.3d at 758; *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 524 (7th Cir. 1991). More recently, in affirming the district court's decision in *Wolf*, the Seventh Circuit agreed that "Illinois law likely permits outside reverse veil-piercing because, for equitable reasons, Illinois courts have approved of veil-piercing claims that do not flow in the traditional direction." *Reid v. Wolf (In re Wolf)*, Nos. 23-1045, 23-1046, 23-1047, 23-1048, 2023 WL 6564882, at *4 (7th Cir. Oct. 10, 2023). The court went on to state as follows:

> [W]e [the Seventh Circuit] have previously concluded that Illinois law would endorse outside reverse veil-piercing. *See Scholes,* 56 F.3d at 758 (allowing trustee to pierce veil of corporations solely controlled by Ponzi schemer); *Sea-Land Servs., Inc.*, 941 F.2d at 524–25 (endorsing outside reverse veil-piercing claim but remanding for want of evidence of injustice). We see no reason to deviate from these decisions; if the Illinois Supreme Court—or the legislature—disagreed, we would have expected a signal in the many years since.

*Wolf*, 2023 WL 6564882, at *4.[40]

In the context of bankruptcy in particular, section 544(a) of the Code authorizes bankruptcy trustees to assert a reverse veil-piercing claim on behalf of creditors. *Koch Refin. v. Farmers Union*

---

[40] The Defendants in this matter do not dispute the validity of outside reverse veil piercing under Illinois law. For a detailed and extensive examination of outside reverse piercing, please see *Graft*, 2025 WL 45085 (Bankr. N.D. Ill. Jan. 7, 2025) (Slade, J.), and *Shakir*, 643 B.R. 203 (Bankr. N.D. Ill. 2022) (Cassling, J.).

*Cent. Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987); *Wolf*, 644 B.R. at 748 (citing *Koch)*.

Nevertheless, reverse veil piercing "is a 'rarity,' and it is rarer yet in bankruptcy." *Barber v. Prod.*

*Credit Servs. of W. Cent. Ill., FLCA (In re KZK Livestock, Inc.)*, 221 B.R. 471, 478 (Bankr. C.D.

Ill. 1998); *see also Scholes*, 56 F.3d at 758 (noting that "[r]everse piercing is ordinarily possible

only in one-man corporations" because seizing corporate assets when there is more than one

shareholder would harm other shareholders).

In response to the alter ego and veil piercing arguments in Count II of the complaint, the

Defendants contend that the Trustee has not cited "a single Illinois case" that "authorizes" the

piercing of a trust veil. (Dkt. 167 ¶ 18.) Relying primarily on *Gierum v. Glick (In re Glick)*, the

Defendants assert that "'[n]o Illinois decision has recognized the piercing of trusts as opposed to

corporations.'" (*Id.* (quoting *Glick,* 568 B.R. 634, 665 (Bankr. N.D. Ill. 2017).) The Defendants

are mistaken.

Since the issuance of *Glick*, Illinois courts have found that alter ego and veil piercing

theories, while traditionally invoked in the context of corporations to reach corporate assets, also

apply to trusts, particularly when trust formalities have not been observed and trust assets have

been used or treated as an extension of an individual. *See Dexia Credit Loc. v. Rogan*, No. 02 C

8288, 2008 WL 4543013, at \*7 (N.D. Ill. Oct. 9, 2008) (noting that "[a] trust may be considered

. . . the alter ego of a . . . debtor if the debtor used the trust's assets for his own benefit and exercised

authority over the trust's assets"); *Graft*, 2025 WL 45085, at \*4 (explaining, as to the applicability

of alter ego and veil piercing to trusts, that the fact that the entity at issue was a trust rather than a

corporation was of no consequence); *see also Sharifeh v. Fox (In re Sharif)*, 457 B.R. 702, 725

(Bankr. N.D. Ill. 2011) (explaining that a trust, like a corporation, possesses "a distinct legal

existence . . . and can sue or be sued through its trustee in a representative capacity on behalf of

66

the trust" (internal quotation omitted)).

Before examining the elements to determine whether the veil of the Trust in this matter should be pierced, the Court notes that, at the outset of the bankruptcy case, the Debtor himself suggested that the Trust was his alter ego. Specifically, at the Debtor's second session of his 341 meeting of creditors on November 19, 2020, the Debtor was asked why the debt that he admitted owing to the Trust was not reflected on his bankruptcy schedules. (Ex. C at 3.) In response, the Debtor testified as follows:

> A: Because I treated it as one and the same, almost. It's my alter, that is an alter ego.
> Q: The Discretionary Trust is your alter ego?
> A: Well the terms and conditions mean I'm gonna sue myself for this, you know, I didn't perceive the interpretation in terms of a normal creditor.
> Q: But you're saying that you didn't list it because you had considered the Discretionary Trust your alter ego?
> A: In a sense, yes. That's why I didn't do it. I didn't . . . interpret it like a normal creditor.

(*Id.*) When confronted at trial with this testimony, which, Trustee's counsel suggested, was an admission, the Debtor stumbled as he tried to offer an explanation, with emphasis on the fact that he had used the word "almost" in stating that the Trust was his alter ego:

> A: [W]hen it came to that particular line of questioning, I took -- I said -- I used -- and I did in my cross use the word that says "almost." And so that, along with what I'm explaining about the 541(c)(2), is in mind. Even as an attorney, I knew what corporate veil was about. So, of course, I wasn't thinking in terms of alter ego of a trust, and so, therefore, my comments were, according to saying, well, you know it's kind of part of me, but it's not really part of me. It's not -- they're two legal distinctions, which is why I'm reciting the 541(c)(2). I knew that they were completely different. Did I express it with clarity? No.
> Q: I'm just asking what you meant by that when you made that statement, "It's kind of my alter ego." What did you mean by that?
> A: Well, in psychological terms, like, there's two parts to you. And what I said about "almost," is like there are two distinct parts of Jim: One is his Discretionary Trust, and one is that.

(Tr. 3 at 636:21–637:17.)

Regardless of whether the Debtor stated or believed that the Trust is his alter ego, the documentary and testimonial evidence at trial resoundingly demonstrates most of the factors that Illinois courts use to determine if there is a unity of interest for purposes of veil piercing. As discussed at length above, that evidence shows that the Debtor exercised total control and dominion over the Trust, using its assets as his own to benefit himself, with little to no input or involvement from Labus.

Specifically, the Debtor failed to observe Trust formalities by shifting funds and assets from the Trust and its accounts to his personal accounts and those of his Revocable Trust. He neglected to instruct Labus of his investment decisions in writing as required by the terms of the Trust. And he made loans to himself without consulting Labus and then unilaterally forgave those loans by executing a waiver of any claims that the Trust had against his bankruptcy estate.

As for Labus, he served as the non-restricted trustee of the Trust in only the most detached and passive ways. Although he acknowledged that his job as trustee was to safeguard and administer the Trust assets, Labus lacked both knowledge and involvement in the operation of the Trust. He was not a signatory on the Trust's bank accounts. He never took an inventory or otherwise accounted for the assets in the Trust. And he failed to ensure that the Debtor did not exceed his authority as a restricted trustee, which allowed the Debtor to run roughshod over others in administering the Trust and using its assets. In short, Labus was essentially a nonfunctioning trustee.

With respect to Trust records, there were no written documents kept of the outstanding balance and repayment of the Revolving Loan and no itemized list distinguishing between property that the Debtor owned and property belonging to the Trust. In fact, there were few if any written records pertaining to the Trust because, according to both Labus and the Debtor, most if not all of

68

their communication in connection with Trust business was conducted by telephone or in person and was seldom if ever memorialized. Indeed, as discussed *supra* in connection with the Trustee's Adverse Inferences Motion, with the exception of certain limited materials, neither the Debtor nor Labus produced any documents requested by the Trustee in his subpoenas.

Finally, the Debtor commingled both the assets and the funds of the Trust, making it impossible for Labus to secure or otherwise protect them. By failing to segregate the Debtor's own personal assets from those of the Trust, there was simply no way of knowing the true owner of the various personal items. The Debtor also obscured the differences in the process of selling the Trust's Personal Property by entering into consignment and sales agreements in his own name—with no mention of the Trust—and depositing the checks for the sales proceeds, made payable to the Debtor alone, into his personal bank accounts or those of his Revocable Trust. Similarly, establishing the BMO bank accounts with only the Debtor's name on the checks—without identifying the Trust or the Debtor's fiduciary role as trustee—gave "the appearance" of commingling to third parties. (*See* Tr. 2 at 355:5–23.) In addition, the Debtor commingled funds by paying personal expenses directly with Trust funds and continues to receive income for that purpose from the Trust.

In sum, the evidence establishes that the Debtor treated the Trust assets as an extension of himself, using those assets for his own benefit and exercising complete authority over them. He failed to observe trust formalities, did not consult with or keep his co-trustee informed, failed to create or maintain Trust records, commingled Trust funds and assets, and diverted those funds and assets to himself or his Revocable Trust. In essence, the Trust, then, was a "mere façade" of the Debtor. As such, the Court finds that there was—and is—such "unity of interest and ownership" in this matter that the "separate personalities" of the Trust and the Debtor "no longer exist."

69

Accordingly, the first element of the veil-piercing test has been established.

Turning to the second element, the Court also finds that circumstances existed in this matter such that "adherence to the fiction" of a separate Trust existence would promote injustice or inequitable consequences. The Seventh Circuit has noted that although the "promotion of injustice" element requires something less than "an affirmative showing of fraud," it requires something more than the mere prospect of an unsatisfied judgment. *Sea–Land Servs.*, 941 F.2d at 522–23. In reviewing Illinois cases to determine how the "promote injustice" part of the veil-piercing inquiry has been interpreted, the Seventh Circuit has observed that the corporate veil has been pierced to, among other things, (1) prevent unfair enrichment, *see B. Kreisman & Co. v. First Arlington Nat'l Bank*, 415 N.E.2d 1070, 1073 (Ill. 1980); (2) keep a party from escaping responsibility or ignoring obligations, *see Gromer, Wittenstrom & Meyer, P.C. v. Strom*, 489 N.E.2d 370, 374 (Ill. App. Ct. 1986); and (3) prevent manipulation of corporations to the benefit of one and the detriment of another, *see Van Dorn*, 753 F.2d at 569, 572–73. *Sea–Land Servs.*, 941 F.2d at 523–24.

In this matter, failure to pierce the Trust veil under the circumstances here would allow the Debtor to shield assets—those that he has both commingled and wrongly treated as his own—from administration and distribution in the bankruptcy case. The result would be to unfairly enrich the Debtor, permitting him to escape financial responsibility and ignore obligations to his creditors, as well as to condone his manipulation of the Trust.

Based on the foregoing, the Court concludes that the Trust is an alter ego of the Debtor and that, as such, the Trust and the Debtor should be treated as one and the same. Accordingly, the Court will allow the Trust veil to be pierced so that the Trustee may reach the assets of the Trust on behalf of the Debtor's creditors. The Defendants' request for a directed finding on Count II is

denied.

### Counts III and IV: Avoidance of the Personal Property Transfer

Counts III and IV of the adversary complaint pertain to the Transfer of various assets to the Trust, made by the Debtor on July 3, 2018, as alleged repayment for certain amounts due and owing to the Trust. (Dkt. 80 ¶ 19.) The assets at issue consisted of artwork, paperweights, jewelry, furniture, and other personal property, most of which were located in the Debtor's personal residence in Oak Brook, Illinois. (*Id.*) The Trustee seeks avoidance of the purportedly fraudulent Transfer pursuant to section 544 of the Bankruptcy Code, 11 U.S.C. § 544, and sections 5 and 6 of the Illinois Uniform Fraudulent Transfer Act (the "UFTA"), 740 ILCS 160/5 & 6.[41]

### 1.   Avoidance Pursuant to Section 6(b) of the UFTA

In Count III of his complaint, the Trustee bases his avoidance claim on subsection (b) of section 6 of the UFTA, which addresses transfers made to insiders. Specifically, section 6(b) provides that "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." 740 ILCS 160/6(b). As such, section 6(b) provides for a state court fraudulent transfer claim applicable to insiders. A cause of action under that statute is "constructive fraud" because it does not include any element of intent. *See Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)*, 480 B.R. 820, 850 (Bankr. N.D. Ill. 2012). To prevail under section 6(b), the Trustee must show, by a preponderance of the evidence, that (1) the Debtor made a transfer to an insider; (2) for an antecedent debt; (3) that the Debtor was insolvent at the time; and (4) that the

---

[41] Section 544(b)(1), the Bankruptcy Code's "strong-arm statute," expressly permits a trustee to avoid any transfer of an interest of the debtor in property that is voidable under applicable state law. 11 U.S.C. § 544(b)(1).

insider had reasonable cause to believe that the Debtor was insolvent.[42] *See* 740 ILCS 160/6(b);

*McHugh v. Anderson (In re McHugh)*, Bankr. No. 02 B 10425, Adv. No. 02 A 00254, 2003 WL

21018601, at *7 (Bankr. N.D. Ill. May 1, 2003); *see also Paloian v. LaSalle Bank Nat'l Ass'n (In

re Doctors Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 632 (Bankr. N.D. Ill. 2013); *Bachrach*, 480

B.R. at 852, 859. The Court examines each of these elements in turn.

First, the Trustee alleges that the Trust is an insider for purposes of section 6(b). The

Bankruptcy Code defines the term "insider" in connection with the alleged insider's relationship

to the debtor. When the debtor is an individual, as is the case here, section 101(31) defines an

"insider" to include: (1) a relative of the debtor or of a general partner of the debtor; (2) a

partnership in which the debtor is a general partner; (3) a general partner of the debtor; or (4) a

corporation of which the debtor is a director, officer, or person in control. 11 U.S.C.

§ 101(31)(B).[43] The list in the definition is intended to be illustrative—not exhaustive. *In re

Longview Aluminum*, 657 F.3d 507, 509 (7th Cir. 2011); *In re Krehl*, 86 F.3d 737, 741 (7th Cir.

1996).

---

[42] Although the Defendants did not raise the issue in connection with Count III, the Court notes that a claim brought under section 6(b) will be barred if not commenced within one year after the transfer was made. 740 ILCS 160/10(c). The statute of limitations here, however, is not an impediment to the Trustee's claim, because he can avoid transfers beyond the one-year statute of limitations imposed by the UFTA pursuant to section 544(b) of the Bankruptcy Code. Under subsection (1) of that statute, "[a] trustee stands in the shoes of an actual unsecured creditor and becomes subject to the same rights and limitations that the actual unsecured creditor would be subject to outside of bankruptcy." *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 708 (Bankr. N.D. Ill.) (explaining that the trustee's power under section 544(b) is derivative of that of an actual unsecured creditor under the applicable law). The provision allows a "trustee to do in a bankruptcy [case] what a creditor would have been able to do outside of bankruptcy—except the trustee will recover the property for the benefit of the estate." *In re. Equip. Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014). Accordingly, "if any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee can use § 544(b) to obtain that asset for the estate." *In re Leonard*, 125 F.3d 543, 544 (7th Cir. 1997). In this matter, the Court finds that the Trustee can step into the shoes of the IRS as "the triggering creditor (the so-called[] 'golden creditor')," *Kaiser* 525 B.R. at 703–04, and use the ten-year limitations window available to the IRS for the collection of assessed taxes, *see* 26 U.S.C. § 6502(a)(1), because the IRS is a creditor holding an unsecured claim allowable under section 502 in the Debtor's bankruptcy case (*see* Claims Register, Claim #1; Dkt. 61 at 5).

[43] The UFTA's definition of "insider" is substantially the same as the one under section 101(31) of the Bankruptcy Code. *See* 740 ILCS 160/2(g)(1).

When a person or entity alleged to be an "insider" does not fit within one of the categories explicitly listed under the Code, that person or entity may qualify as a non-statutory insider. Indeed, the legislative history of section 101(31) "suggests that, in addition to the individuals and entities actually named, the term [insider] also encompasses anyone with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor.'" *Krehl*, 86 F.3d at 741–42 (quoting S. Rep. No. 989, at 25 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5810). Thus, the insider status inquiry becomes a fact-intensive one, which must be made on a case-by-case basis. *Longview Aluminum*, 657 F.3d at 509; *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.*), 335 B.R. 539, 547 (D. Del. 2005).

In determining whether a person or entity is a non-statutory insider, courts generally consider two factors: (1) the closeness of the relationship between the debtor and the alleged insider, and (2) whether any transactions between the debtor and the alleged insider were conducted at arm's length. *Krehl*, 86 F.3d at 742; *In re S. Beach Sec., Inc.*, 376 B.R. 881, 890–91 (Bankr. N.D. Ill. 2007), *aff'd,* 421 B.R. 456 (N.D. Ill. 2009), *aff'd,* 606 F.3d 366 (7th Cir. 2010); *McHugh*, 2003 WL 21018601, at *10. As to the first factor, the relationship must be "close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." *S. Beach Sec.*, 376 B.R. at 890–91 (internal quotation omitted). Although the alleged insider's degree of control over the debtor is relevant to the inquiry, it is not dispositive. *Id.* at 891; *see also U.S. Bank N.A. v. Vill. at Lakeridge, LLC (In re Vill. at Lakeridge, LLC)*, 814 F.3d 993, 1001 n.12 (9th Cir. 2016)(explaining that "if actual control were required for non-statutory insider status, all non-statutory insiders would also be statutory insiders under 11 U.S.C. § 101(31)"), *aff'd*, 138 S. Ct. 960 (2018). With respect to the second factor, an arm's-length transaction is a transaction "entered into in good faith in the ordinary course of business by

unrelated parties with independent interests." *Dixon v. Am. Cmty. Bank & Trust (In re Gluth Bros. Constr., Inc.*), 424 B.R. 379, 393 (Bankr. N.D. Ill. 2009) (internal quotations omitted). *See also Arm's-Length Transaction*, Black's Law Dictionary (10th ed. 2014) (defining the term as "1. A transaction between two unrelated and unaffiliated parties. 2. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises").

In this matter, the Court finds that the Trust qualifies as an insider of the Debtor. Indeed, the Debtor and the Trust have such a close, intertwined relationship that, by his own testimony, the Debtor considers the Trust his alter ego and treats the assets of the Trust as an extension of himself. As a result, the Debtor has been able to consistently use those assets for his own benefit and exert complete control over them. Further, as addressed in detail *supra*, as the beneficiary, co-trustee, and investment advisor of the Trust, the Debtor has effectively stood on all sides of the many transactions in which the Trust has been involved. He has made loans to himself and then forgiven them. He has unilaterally made investment decisions and then executed them at his sole discretion. He has conducted Trust business by entering into contracts in his own name, and he has deposited proceeds from the sales of the Trust assets into his own personal accounts or those of his Revocable Trust.

Likewise, the Debtor straddled both sides of the Transfer at issue, making that Transfer the very antithesis of an arm's-length transaction. Specifically, the Debtor signed the Bill of Sale in connection with the Transfer as trustee of both his Revocable Trust and his Discretionary Trust; he agreed—on behalf of both parties to the transaction—to the value of the property transferred; and he was the only one of the two trustees who knew which items were actually involved in the Transfer. Because it was not conducted in the ordinary course of business by unrelated parties with

74

independent interests, the Transfer was anything but an arm's-length transaction. For all of these reasons, the Court finds that the Debtor made the Transfer to an insider, and that element under section 6(b) has been satisfied.

The evidence at trial also established that the Transfer was made for an "antecedent debt." Although the Bankruptcy Code does not define that term, courts agree that "antecedent debt" means "a debt incurred before the transfer." *Nealey v. Ohio Att'y Gen. (In re Nealey)*, 673 B.R. 365, 391 (Bankr. S.D. Ohio 2025) (internal quotation omitted) (discussing the element in the context of section 547(b) of the Code); *see also Upstairs Gallery, Inc. v. Mackowe W. Dev. Co. (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 918 (B.A.P. 9th Cir. 1994) (explaining that "[w]hether a debt is antecedent . . . depends on when it was incurred"). The parties here do not dispute that the Transfer at bar was made in connection with the Revolving Loan of $10 million to the Debtor's Discretionary Trust from his Revocable Trust, for which a note was executed on January 1, 2000. Because it was made more than eighteen years after the corresponding debt was incurred, the Court finds—and the parties do not dispute—that the Transfer was made for an antecedent debt.

Although he has established the foregoing elements, the Trustee cannot prevail on his claim under section 6(b) because the evidence at trial did not demonstrate that the Debtor was insolvent at the time the Transfer was made. Under the Bankruptcy Code, "insolvent" is defined as a "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32). The UFTA defines "insolvent" in much the same way. 740 ILCS 160/3 (providing that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation"). *See also Baldi v. Samuel Son & Co.*, 548 F.3d 579, 581 (7th Cir. 2008) (stating that both the Bankruptcy Code and the UFTA define "insolvency" "as having a balance sheet on which liabilities exceed assets"). Among the tests used

to decide whether an individual or entity is insolvent under both the Code and the UFTA are the "balance sheet" test, the "inadequate capital" test, and the "inability to pay debts as they become due" test. *Doctors Hosp.*, 507 B.R. at 632 (internal quotations omitted). Whether an individual or entity is insolvent is a question of fact, and bankruptcy judges have "broad discretion" in making that determination. *Id.*

In this matter, the Trustee put on little to no evidence at trial to establish that the Debtor was insolvent—at the time of the Transfer or in general. He offered no balance sheet showing dollar figures or other information about the Debtor's assets or liabilities in or around July 2018 when the Transfer was made, presented no compelling evidence about the Debtor's ability or inability in 2018 to pay his debts as they became due, and failed to elicit any testimony from the Debtor to establish his financial condition at the relevant time. As to the latter, the Debtor, for his part, consistently testified that, although he may have been illiquid at various times over the years, he was never insolvent. The Trustee made little to no effort to explore or otherwise dispute that claim. Nor did the Trustee offer a witness to demonstrate that the Debtor was insolvent when the Transfer was made.

In sum, the Trustee failed to meet his burden to establish that the Debtor was insolvent at the time of the Transfer or that the Trust had reasonable cause to believe that the Debtor was insolvent at that time. Other than indirectly suggesting or making offhand conclusory statements as to the Debtor's insolvency, the Trustee altogether failed to show that the Debtor was not solvent when the Transfer was made.[44] Accordingly, the Court finds in favor of the Defendants and against

---

[44] Among those conclusory statements, the Trustee asked the Debtor: "[W]hat was the benefit to the Trust [to waive its claim against the bankruptcy estate] if it was never going to get any money out of the estate anyways *because the estate was insolvent* . . . ?" (Tr. 3 at 564:21–25 (emphasis added)). Similarly, in his closing statement, the Trustee said: "Was the debtor insolvent or became insolvent after the transfer was made? No question about that." (Tr. 4 at 818:3–5.)

the Trustee on Count III of the adversary complaint. The Defendants' request for a directed finding as to that count is granted.

## 2. Avoidance Pursuant to Section 5(a) of the UFTA

In Count IV of the complaint, the Trustee invokes section 5(a)(1) of the UFTA, which provides, in pertinent part, that "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . with actual intent to hinder, delay, or defraud any creditor of the debtor."[45] 740 ILCS 160/5(a)(1). As the party seeking to avoid the Transfer at issue here, the Trustee bears the burden of proving actual fraud by clear and convincing evidence. *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 777 (Bankr. N.D. Ill. 2007). "The burden of dispelling an implication of fraud for the transfer," however, rests "on the debtor and the donee of the transfer." *Nw. Mem'l Hosp. v. Sharif*, 22 N.E.3d 1217, 1227 (Ill. App. Ct. 2014).

"Because direct evidence of fraudulent intent is rarely available, intent can be inferred," for purposes of paragraph (1) of subsection 5(a), "from the circumstantial presence of certain factors, or 'badges of fraud.'" *CLC Creditors' Grantor Tr. v. Howard Sav. Bank (In re Com. Loan Corp.)*, 396 B.R. 730, 746 (Bankr. N.D. Ill. 2008). Indeed, the UFTA itself lists various factors for courts to consider in determining whether a debtor made a transfer with "actual intent," including whether: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) before the transfer was made, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or

---

[45] In contrast to a cause of action under section 6(b), a claim brought under section 5(a)(1), the actual fraud provision of the UFTA, must be brought within four years after the transfer was made or, if later, "within one year after the transfer . . . was or could reasonably have been discovered by the claimant." 740 ILCS 160/10(a).

concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. 740 ILCS 160/5(b). "In sufficient number, these badges of fraud may raise an inference of actual fraud." *Com. Loan Corp.*, 396 at 746 (noting that the factors in the non-exhaustive statutory list are merely considerations, and that, thus, "no set number or combination automatically demonstrates fraudulent intent").

In this matter, the Trustee argues that direct evidence at trial establishes that the Transfer to the Trust was made by the Debtor with actual intent to hinder, delay, or defraud his creditors. According to the Trustee, the Debtor made the Transfer not to pay down his debt, as the Debtor claims, but rather to shield the Personal Property at issue from his former spouse. Indeed, the Trustee says, the Transfer was made just after the entry of a judgment on July 2, 2018 in the Debtor's divorce proceeding, requiring him to make substantial spousal support payments to his ex-wife.

In response, the Defendants argue that the Transfer occurred on July 3, 2018, because the division of the marital property coincided with the divorce decree. According to the Defendants, a significant issue in the divorce litigation was the characterization of property as either "marital" or "non-marital." They contend that only after the Debtor's ownership of the Personal Property, among other things, was designated as "non-marital" was the Debtor able to make the Transfer of that property. Thus, the Defendants argue, the timing of the Transfer was "coincidental" to the resolution of the ownership and payment obligations.

78

The Defendants' argument does not negate the Trustee's contention that the Debtor made the Transfer with intent to defraud his creditors. As the evidence established at trial, just one day before the Transfer of the Personal Property, a judgment was entered in the Debtor's divorce litigation requiring him to, among other things, pay his ex-spouse maintenance of more than $1.7 million. The very next day, the Debtor transferred Personal Property worth allegedly $3 million into his Trust, shielding those assets from his creditors—including his ex-wife. The Defendants' suggestion that this timing was coincidental and not probative of the Debtor's intent is simply not convincing.

In addition to the timing of the Transfer, the uncontested trial testimony also demonstrates that the Debtor moved the Personal Property to his Trust in order to foil his ex-wife. As the Trustee quite rightly notes, Labus stated at trial that among the things he did as trustee to safeguard the assets of the Trust was to protect those assets "from spouses." (Tr. 1 at 31:25–32:3.) Specifically, Labus testified that when the Debtor got divorced, Labus had to protect him "from trying to agree to certain things for his wife, to make sure that the Trust assets were not in any way harmed." (*Id.* at 33:4–7.)

Based on the timing of the Transfer, Labus's testimony, and the Debtor's complete lack of credibility, the Court finds that the Debtor made the Transfer at the time that he did with the intent to prevent his creditors—his ex-spouse among them—from reaching the assets. Bolstering this conclusion is ample evidence to establish the circumstantial presence of many of the badges of fraud set forth above.

First, given the closeness of the relationship between the Debtor and the Trust, as well as the many transactions between them which were not conducted at arm's length, the Court has

79

already determined that the Trust was an insider of the Debtor. Thus, the Transfer was made by the Debtor to an insider.

Second, the Debtor retained possession and control of the personal property after it was transferred. Labus himself acknowledged at trial that nothing other than legal title changed vis-à-vis the Personal Property before and after it was transferred to the Trust. (*Id.* at 160:4–8 (discussing, in particular, the paperweights).) Although Fitzpatrick testified that it is "not unusual for trust assets to be in the residence of a beneficiary" (Tr. 2 at 308:1–2), not only did the Personal Property at issue remain in the Debtor's home after the Transfer, but the Debtor retained the ability to sell any of the assets at any time, at his sole discretion.

Third, although the Transfer was a private sale of personal property between two parties, the Debtor did not disclose the transaction to anyone else. He did not provide a copy of the Bill of Sale to any third party. In selling or consigning the assets, he did not indicate that they were owned by the Trust, and he failed to identify each item in his description of the Transfer on his amended Statement of Financial Affairs. He also did not account for the Transfer on the personal financial statements that he provided to MB Financial Bank.

Fourth, the evidence clearly establishes that the Debtor was sued or threatened with suit prior to the Transfer. On June 5, 2018, the John Samatas Discretionary Trust demanded payment from the Debtor of the balance that was due pursuant to the promissory note on the $6 million loan from John's Trust to the Debtor's Discretionary Trust. (*See* Claims Register, Claim #21-1.) After the Debtor failed to pay, John's Trust filed a breach of contract complaint against both the Debtor and his Trust, seeking more than $4 million. In addition, the law firm of Cohen & Lord asserted a counterclaim against the Debtor and the Trust in pending litigation, seeking attorney's fees and interest totaling over $4.3 million. (*See id.*, Claim #30-1.) Although that counterclaim was not filed

80

until November 29, 2018, the documentation attached to the law firm's proof of claim in the bankruptcy case firmly demonstrates that the Debtor was aware of the threat of litigation well before the Transfer was made. At the same time, the Debtor was battling his wife in a contentious divorce proceeding, which began in 2014. As discussed above, the proceeding concluded with entry of a judgment on July 2, 2018, one day before the Transfer was made, which required the Debtor to, *inter alia*, pay his ex-spouse support in the total amount of $1,740,000, at the rate of $20,000 per month.

Fifth, the Transfer occurred shortly after a substantial debt occurred. Indeed, as just stated, the Debtor made the Transfer the day after the divorce court entered a $1.7 million judgment against him.

Finally, the value of the consideration received by the Debtor was not reasonably equivalent to the value of the assets transferred. The Bankruptcy Code does not define the term "reasonably equivalent value." The Seventh Circuit, however, has explained that the test used to determine "reasonably equivalent value" requires the court to consider the value of what was transferred compared to the value of what the debtor received. *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007); *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). The determination is not "a fixed mathematical formula." *Barber*, 129 F.3d at 387; *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 710, 731–32 (Bankr. N.D. Ill. 2006) (internal quotations omitted), *aff'd*, 2007 WL 1498906 (N.D. Ill. May 18, 2007). Instead, "the standard for [r]easonable equivalence should depend on all the facts of each case." *Barber*, 129 F.3d at 387 (internal citations omitted). To determine "reasonably equivalent value, courts must consider: "(1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and received; (3) whether the transaction took

place at arm's length; and (4) the good faith of the transferee." *See 1756 W. Lake St., LLC v. Am. Chartered Bank*, 14 C 1869, 2014 WL 5073354, at *4 (N.D. Ill. Oct. 9, 2014), *aff'd*, 787 F.3d 383 (7th Cir. 2015). Because the value must be only "reasonably equivalent," a "debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." *Barber*, 129 F.3d at 387 (internal quotation omitted). The burden of proving lack of reasonably equivalent value rests on the Trustee. *See id.*

In this matter, the Defendants argue that the value of the consideration received by the Debtor was reasonably equivalent to the value of the assets transferred because: (1) the parties and their attorneys in the Debtor's divorce proceeding agreed that the Personal Property at issue was worth $3 million, a figure at which they arrived based on the aggregate purchase price of the items; (2) the Bill of Sale reflected that $3 million would be applied to reduce the amount owed by the Debtor's Revocable Trust to his Discretionary Trust; and (3) Labus agreed that the Debtor's debt to the Trust would be reduced, dollar-for-dollar, by the value decided upon by the Debor, his ex-wife, and their lawyers.

At first blush, this argument seems logical and straightforward. Examined under the lens of the relevant case law, however, the problems with the Defendants' theory are blatantly evident. Specifically, only the first factor in the analysis is arguably satisfied: the value of the property transferred—agreed by the Debtor, his ex-spouse, and their attorneys to be $3 million—was equal to the $3 million reduction of the debt owed by the Debtor to the Trust. This figure, however, does not represent the fair market value of the Personal Property. *See 1756 W. Lake St.*, 2014 WL 5073354, at *4 (defining "fair market value" as "the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction" (internal quotation omitted).) Although Labus testified that the loan balance would be increased or reduced to account

82

for the prices at which the items of property were actually sold, he conceded that such an adjustment was not memorialized in the Bill of Sale, but, rather, was simply the "understanding" that he and the Debtor "came to."[46] (Tr. 1 at 214:2–216:23.) Moreover, as discussed *supra*, the Transfer was decidedly not an arm's-length transaction between two parties conducted as if they were strangers so that no conflict of interest would arise. Rather, the Debtor prepared the Bill of Sale on behalf of both buyer and seller, and he agreed for both parties on the value of the property. The good faith of both the transferor and the transferee is plainly dubious. Based on this analysis, the reasonably-equivalent-value factor ultimately weighs in favor of the Trustee.

As discussed *supra* in the context of Count III of the adversary complaint under section 6(b) of the UFTA, the Court has already found that the Trustee failed to demonstrate that the Debtor was or became insolvent, either before or after he made the Transfer. Nevertheless, the Court concludes that a sufficient number of badges of fraud in this matter raises an inference of actual fraud. Based on that inference, combined with the timing of the Transfer, Labus's testimony about safeguarding the Trust assets to protect them from the Debtor's ex-wife and other potential creditors, and both the Debtor's and Labus's lack of credibility throughout the trial, the Court concludes that the Debtor made the Transfer to his Trust with the intent to hinder, delay, and defraud his creditors. As such, the Court finds in favor of the Trustee and against the Defendants on Count IV of the adversary complaint. The Defendants' request for a directed finding on Count IV is denied.

### Count V: Injunctive Relief

---

[46] The Transfer Document does provide that "[t]he value [of the Personal Property] shall be determined from the original purchase price of said items, increased/decreased by estimate market value and subject to final price realized at [the] time of sale by the . . . Discretionary Trust." (Ex. D.) However, the parties were unable to provide an explanation—cogent or otherwise—as to why that document, executed by the Debtor on behalf of both his Revocable and Discretionary Trusts on the same day as the execution of the Bill of Sale, was created or needed.

In Count V of his complaint, the Trustee seeks an injunction prohibiting the Debtor or Labus from transferring or encumbering any asset of the Trust until the Court has made a decision as to whether the Trust assets are property of the estate. Because the Court has made such a determination in this Memorandum Opinion, the Trustee's request is moot.

**Count VI: Recovery of the Avoided Transfer Under Section 550(a) of the Bankruptcy Code**

Finally, in Count VI of the adversary complaint, the Trustee seeks recovery of the value of the Transfers under section 550(a) of the Bankruptcy Code. That statute sets forth the parties from whom avoided transfers can be recovered, *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 880 (Bankr. N.D. Ill. 2006), and provides, in pertinent part, as follows:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

Section 550(a) is a statute that works in conjunction with section 544, among others, to provide recovery of transfers found to be avoidable. *See Brown v. Caruso (In re Kogos)*, Bankr. Nos. 10 B 05807, 10 B 00764, Adv. Nos. 10 A 01317, 10 A 01318, 2010 WL 4928913, at *6 (Bankr. N.D. Ill. Nov. 30, 2010). Because the Court has concluded that the Transfer made by the Debtor to the Trust is avoidable under section 5(a) of the UFTA pursuant to section 544 of the Code, the Trustee is entitled to recover the value of the Transfer from the Defendants pursuant to section 550(a), and judgment will be entered in the Trustee's favor on Count VI of the complaint.

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of the Trustee and against the Defendants on Counts I, II, IV, and VI of the adversary complaint and finds in favor of the Defendants and against the Trustee on Count III. Count V will be dismissed as moot. The Trustee's Adverse Inferences Motion will be granted as discussed herein, the Defendants' request for a directed finding will be denied on Counts I, II, and IV, and their request for a directed finding on Count III will be granted. A separate order will be entered consistent with this Memorandum Opinion.

**Dated**: March 2, 2026                                **ENTERED**:

_____
Janet S. Baer
United States Bankruptcy Judge